Kirk **DAHL, et al.,** on behalf of themselves and all others similarly situated, **Respondents,**

v.

**CHARLES SCHWAB & CO., INC.,** Petitioner, **Appellants.**

No. C1–94–1040.

Supreme Court of Minnesota.

April 19, 1996.

Steve Gaskins, Jeannine L. Lee, Minneapolis, Norman J. Barry, Jr., Barrie L. Brejcha, Chicago, IL, for Appellants.

Gavin S. Wilkinson, Mark Reinhardt, St. Paul, Karl L. Cambronne, Jeffrey D. Bores, Minneapolis, Charles H. Johnson, New Brighton, Garrett D. Blanchfield, Jr., St. Paul, for Respondents.

Robert L. Schell, Jr., Jeffrey D. Hedlund, R. Christopher Sur, Minneapolis, Stuart J. Kaswell, Senior Vice President & Gen. Counsel, Securities Industry Ass'n, Inc., Washington, DC, Amicus Curiae.

## OPINION

GARDEBRING, Justice.

This case calls upon us to decide if federal regulation of the national securities market preempts the application of Minnesota common and statutory law to certain securities sales in Minnesota.

Respondents are Minnesota citizens who utilized appellant Charles Schwab & Co. as their broker for the buying and selling of securities. Schwab charges a commission to its customers for its services, but also, as is common within the securities industry, Schwab receives payments from wholesale securities dealers for the routing of buy and sell orders like those of respondents. These payments, called payments for order flow, involve the remittance of a few pennies per share to a broker-dealer, such as Schwab, as incentive to the broker-dealer to route its customers' orders through the wholesaler.

Respondents allege that these payments—which they label kickbacks—constitute a breach of Schwab's fiduciary responsibilities under the state's common law of agency and a violation of Minnesota Uniform Deceptive Trade Practices Act, Minn.Stat. § 325D.43–48, and the Minnesota Prevention of Consumer Fraud Act, Minn.Stat. § 325F.68–70. Respondents therefore filed three separate but similar class actions contending that Schwab's acceptance of order flow payments violated these Minnesota common law and statutory requirements. Respondents sought relief of several kinds:

1) an accounting of all of Schwab's profits received in transactions conducted on respondents' behalf;

2) the forfeiture of all payments made to Schwab by any wholesale stock dealers for routing of either respondents' or class members' securities transactions;

3) a declaration that Schwab fraudulently concealed its wrongdoing; and

4) an injunction to prevent Schwab from receiving payment for order flow without the customers' consent.

Schwab moved to dismiss the complaints, asserting that granting the relief sought by respondents would violate the Supremacy Clause, and thus, that application of Minnesota law was in this instance preempted by SEC rulemaking. The trial court agreed and entered summary judgment in favor of Schwab. The court of appeals, however, reviewed the SEC rules governing order flow and concluded that the additional disclosure allegedly required by the application of Minnesota law was neither inconsistent with the then-applicable federal rules, nor an obstacle to the accomplishment of the objectives of the federal regulations. The court of appeals declined to consider the application of recent SEC rules, which had not then come into force. We reverse, concluding that, indeed, the SEC rules impliedly preempt the application of Minnesota's com-

mon law of agency and statutory consumer protection provisions.[1]

The 1934 Securities Act created the Securities and Exchange Commission, charging it with the close regulation and oversight of the national securities market. 15 U.S.C. § 78b (1992). This regulatory activity is conducted with the assistance of the industry itself. For example, participants in the securities market are also regulated by private associations, called self-regulatory organizations or SROs, which engage in rulemaking and oversight similar to and closely tied to that of the SEC and serve as a source of valuable information for SEC regulatory efforts. Though private, the activities of SROs are related to regulation by the SEC to the extent that their internal rules are subject to SEC review and approval. 15 U.S.C. § 78s(b). The SEC may even adjust these internal rules if it decides that to do so will further the purposes of the Act. 15 U.S.C. § 78s(c).

Order flow payments, the mechanism at the heart of this lawsuit, are commonly used in the securities industry. Order flow involves the activities of wholesale securities dealers, broker-dealers, and purchasers of stock. The wholesale dealers, sometimes called market makers, profit on the difference between the price they offer for purchase and the price they offer for sale of a particular stock. A wholesaler, therefore, may buy 10 shares at $10 per share and sell 10 shares at $10¼ per share to make a gross profit $.25 per share, or $2.50. Because their margin is so narrow, wholesale stock dealers must buy and sell in great volume—the more trades, the more profit. Thus, in an attempt to maintain a continuous flow of orders, some wholesaler dealers share a portion of their gross profit with the broker-dealers. This payment, usually some percentage of the gross profit of a large block order of stock transactions, encourages the broker-dealers to keep their orders flowing to a particular wholesale dealer.

The practice of payments for order flow began in the 1960s and is now widespread in the securities industry. The SEC estimates that between 15% and 20% of order flow is in listed stocks pursuant to cash payment arrangements. There is, however, no available estimate for the dollar amount paid in order flow inducements. Paying for order flow and the question of whether or not it can be quantified on a per share basis is controversial within the securities industry. Some industry participants believe that the fact that a market maker would be unwilling to pay for the placing of a single order does not negate the connection between payment for order flow and the order. These industry members point out that order flow payments are usually specified in an amount per share.

In contrast, other industry players contend that the benefits derived from aggregating orders cannot be parsed out to such a degree as to apply to individual orders because no brokerage firm would negotiate such a small fee reduction (or other benefit) for a single or a small number of orders. In addition, identifying order flow payments on an order-by-order basis is made more difficult by the fact that some order flow payments are noncash equivalents, such as market research services. Observing this controversy, the SEC decided in 1993 to study its overall impact on the industry. *See, e.g.,* SEC Release No. 34–33026 at 29 (October 6, 1993).

In 1977, the SEC adopted rules governing the disclosure necessary between customers and securities dealers. These rules, aggregated in and now commonly referred to as Rule 10b–10, responded to changing market conditions and practices by requiring brokers and dealers to disclose in what capacity a broker or dealer acted when effecting a transaction (*e.g.,* if and for whom the broker or dealer acted as an agent), the time and date of the transaction, the amount of remuneration received, and the source and amount of any other remuneration received. *See* 17 C.F.R. § 240.10b–10 (1994). With respect to the final requirement, however, the SEC noted that, in the case of an ordinary sale (*e.g.,* not a tender offer), the broker or dealer could simply disclose that other remuneration may be received and that the source and

---

1. In addition to arguments and briefing from both sides to this court, the Securities Industry Association submitted a brief as *amicus curiae.* The SIA, a trade association of securities firms, presents arguments substantially similar to those proffered by Schwab.

amount would be made available at the customer's request. *Id.* When it adopted the rule, the SEC noted that it designed the rule to give "the investor the maximum information consonant with cost effectiveness and with his need to make investment decisions." SEC Rel. No. 12806 at 19.

At the time respondents engaged in their securities trading with Schwab, Rule 10b–10 prescribed what information Schwab was obligated to disclose to its customers. These disclosure requirements did not mention order flow specifically and required that, with respect to so-called "other remuneration," brokers need only disclose that they may have received other remuneration and that further information would be available on request. *See* 17 C.F.R. § 240.10b–10(a)(7) (1994). In 1993, the SEC, in accordance with its own and some SRO studies relating to order flow payments, proposed amendments to Rule 10b–10 and offered a new rule for comment. The amendments to Rule 10b–10 defined "order flow payments" as any form or arrangement compensating brokers or dealers in return for the routing of orders. They further required disclosure on each transaction confirmation slip that payment for order flow either was or was not received and that the source and nature of the payment would be available at the customer's request. The new rule, 11Ac1–3, would require annual disclosure to customers of a broker's or dealer's policies regarding receipt of payment for order flow, the market makers to which customer orders are routed, and the aggregate amount of payment received for order flow in the previous year. *See* SEC Rel. No. 34–33026 at 5 (October 6, 1993). These rules were adopted on October 27, 1994, but the effective date of the rules was postponed from April 3, 1995 to October 2, 1995. While the amendments to 10b–10 and new Rule 11Ac1–3 govern order flow payments more directly, they were not in effect during the time of respondent's trading activity and are thus not relevant to our preemption inquiry.

Industry SROs participated in the SEC's study of order flow payments, offered their comments on the proposed rulemaking, and adopted rules of their own. The National Association of Securities Dealers (NASD) is one of the largest SROs and operator of the NASDAQ securities market. In 1984, NASD established a special committee to consider the practice of paying for order flow. This committee eventually concluded that disclosure of such payments should be mandated. *See* SEC Rel. No. 34–33026 (October 6, 1993). The following year, on April 30, 1985, NASD issued a Notice to Members alerting its members of the requirements of Rule 10b–10 and reminding them of the need to obtain best execution of trades for their customers. *See* NASD, Notice to Members No. 85–32 (April 30, 1985). It also explained that NASD was studying the practice for possible rulemaking.

The above discussion indicates that two rules specifically governing order flow payments were effective during the time that respondents traded with Schwab: Rule 10b–10 and the NASD Notice to Members. We must therefore review Rule 10b–10 and the NASD Notice to Members to determine whether the SEC, either expressly or impliedly, has preempted state regulation of order flow payments.

Preemption analysis begins with the assumption that the "historic police powers of the [s]tates" are not to be eclipsed unless to do so was "the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). The clearest indication of such Congressional intent is express language; if Congress expressly preempts state action, the matter is settled. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Without the guidance of express language, courts must decide whether Congress implied the preemption of state regulation.

Schwab and respondents each argue that express preemption analysis favors their position. On the one hand, respondents argue that Congress has expressly defined the preemptive reach of its regulation of market makers, and therefore state-mandated disclosure requirements are not preempted. On the other hand, Schwab counters that SEC Rule 10b–10, the NASD Notice to Members rule, and the SEC study leading up to and

including the proposed Rule 11Ac1–3 amount to federal regulation of disclosure requirements concerning order flow payments, thereby expressly preempting any state regulation on the same subject. Neither contention is persuasive.

Respondents' argument for express preemption centers around the so-called "savings clause" contained in the Exchange Act. 15 U.S.C. 78bb (1992). This clause operates to include state regulation in the universe of regulation covering the securities industry:

> (a) The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; * * * Nothing in this chapter shall affect the jurisdiction of the securities commissions (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder.

15 U.S.C. 78bb(a) (as amended October 13, 1982).

Respondents assert that this clause explicitly defines the areas of state law that are preempted and, thus, other areas of securities regulation are open to the states. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992). In *Cipollone,* the Court, relying on the "familiar principle of *expression unius est exclusio alterius,*" held that a congressional definition of a statute's preemptive scope implies that matters beyond that scope are not preempted. *Id.* Respondents rely on *Cipollone* as support for their assertion that express preemption eliminates the possibility of any determination of implied preemption. They read *Cipollone* to state that, if Congress considered the preemptive possibilities of its legislation and chose to include a provision explicitly on preemption, then Congress has given "'reliable indicium of [its] intent with respect to state authority'" and there is no need to examine whether implied preemption might apply. *Id.* (quoting *Malone v. White Motor Corp.,* 435 U.S. 497, 505, 98 S.Ct. 1185, 1191, 55 L.Ed.2d 443 (1978)).

Respondents' argument, however, does not survive a recent U.S. Supreme Court case on preemption. In *Freightliner Corp. v. Myrick,* — U.S. ——, ——, 115 S.Ct. 1483, 1488, 131 L.Ed.2d 385 (1995), the Court specifically addressed this same contention and found it spurious. The *Freightliner* court held that *Cipollone* does not establish the rule that respondents attempt to construct with a few well-chosen quotes. Instead, "[t]he fact that an express definition of the pre-emptive reach of a statute 'implies'—*i.e.* supports a reasonable inference—that Congress did not intend to pre-empt other matters does not mean that the express clause entirely forecloses any possibility of implied pre-emption." *Id.* Hence, the savings clause does not prevent implied preemption of areas of securities law not specified in the clause.

Schwab's argument for express preemption is grounded in the requirements of Rule 10b–10. It argues, simply, that Rule 10b–10's disclosure requirements cover order flow payments, thus preempting state regulation. *See* 17 C.F.R. § 240.10b–10 (1994). In support of this position, it points to a 1985 NASD notice alerting members that Rule 10b–10 covers order flow payments, asserting that the fact that the SEC did not object to the notice is evidence that the SEC approved of its contents, thus further manifesting an express preemption. As evidence that the rule was intended to cover order flow payments, Schwab cites to a discussion in the same document stating that portions of Rule 10b–10 would "relate to situations where payments were made to the dealer to induce transactions in securities." SEC Rel. No. 12806 at 22 (September 16, 1976).

However, we conclude that such rules do not expressly preempt state activity. At the time of the enactment of Rule 10b–10, the SEC was aware of the practice of order flow payments, despite the fact that it was not widespread. *See* SEC Rel. No. 34–33026 at 11. However, Rule 10b–10 does not plainly state that "other remuneration" includes order flow payments. The SEC, therefore, had no rule in place expressly mentioning order flow payments. It might be possible to read Rule 10b–10 as relating to situations involving paying for order flow, but the language of

the rule does not rise to the level of a "clear and manifest purpose" mandated by the Supreme Court. *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152. Given that there is also no contemporaneous commentary by the SEC indicating that the rule applied to order flow payments, if there is any preemptive force in Rule 10b–10, it is implied, not express.

Schwab also relies on a 1985 NASD notice to its members that Rule 10b–10 applies to order flow payments. The notice alerted members that they should consider payments received for order flow to be "other remuneration" that they should disclose in accordance with Rule 10b–10. Schwab asserts that because the SEC can control the internal rules of self-regulatory organizations like the NASD, its rules should be considered part of the federal regulatory scheme.

■ Schwab's reliance on the NASD notice to its members is also unavailing. If the SEC had issued this notice instead of the NASD, then the express preemption question would be a closer one. But Congress did not delegate supervision of the securities industry to the industry itself. SROs are not governmental agencies, they are private associations. Certainly, the Commission may "abrogate, add to, and delete from * * * the rules of a self-regulatory organization * * *." 15 U.S.C. § 78s(c). Yet, in 15 U.S.C. § 78s(c)(4)(C), Congress stated that "[a]ny amendment to the rules of a self-regulatory organization made by the Commission pursuant to this subsection shall be considered for, all purposes of this chapter to be part of the rules of such self-regulatory organization and shall not be considered to be a rule of the Commission." Therefore, while SROs may regulate, only the SEC does so with the authority of and on behalf of the Congress. The fact that some in the securities industry may have considered Rule 10b–10 applicable to order flow payments has no effect on whether the SEC intended it to be such. Neither Rule 10b–10, nor the NASD Notice to Members, therefore, expressly preempted the application of state law.

■ It is possible, however, that the state regulation at issue here is impliedly preempted by the operation of federal law. The United States Supreme Court has identi-fied a two-pronged analysis for determining whether Congress made such an implication. State law is preempted if Congress has entirely displaced the possibility of state regulation or if state regulation conflicts with federal law. *Pacific Gas & Electric v. State Energy Resources Comm'n*, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). The Court has indicated that four main considerations are relevant to an inquiry into whether Congress has impliedly displaced possible state regulation: 1) the scheme of federal regulation may be so pervasive as to leave no room for supplemental state action; 2) the federal interest may be so dominant that state regulation will be presumptively precluded; 3) the objective of the federal regulation may reveal a preemptive purpose; or 4) the state policy may produce a result inconsistent with that federal objective. *Id.* State law will conflict with federal law when "compliance with both federal and state regulations is a physical impossibility" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963) and *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

■■ Federal oversight of the securities industry is designed to protect the investing public, remove impediments to the smooth operation of a national market system, and impose reporting requirements that would ensure a fair and honest market. *See* 15 U.S.C. § 78b; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, *reh'g denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). Congress delegated to the Securities and Exchange Commission primary responsibility for regulating the securities industry and protecting the public, and gave the SEC broad rule-making authority to effect this goal. *See* 15 U.S.C. §§ 78h, 78i, and 78k (1992). It is clear, however, that Congress did not intend to exclude states from concurrent regulation of the securities industry: "Congress intended to subject the exchanges to state regulation that is not inconsistent with the federal Act." *Merrill*

*Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 137, 94 S.Ct. 383, 394, 38 L.Ed.2d 348 (1973). Thus, state and federal regulation can coexist, but in the case of a conflict, federal law preempts concomitant state regulation. To ascertain if a state law is impliedly preempted, a determination must be made that either compliance with both state and federal law is a physical impossibility, or that the state law presents an obstacle to the accomplishment of the purpose of the federal law. *See Pacific Gas & Electric*, 461 U.S. at 204, 103 S.Ct. at 1722.

There is no denying the fact that the securities industry has a national or, if more broadly considered, an international scope. The order flow payment device is used by stock wholesalers throughout the industry and, therefore, around the nation. Moreover, as respondents reminded us at oral argument, millions of dollars are involved in order flow payments. A decision by this court affecting these payments will no doubt reach far beyond the borders of Minnesota.

As noted earlier, respondents sought various forms of relief, several of which go beyond disclosure of the order flow payment associated with a specific transaction. Schwab admits that complying with both state and federal *disclosure* requirements is theoretically possible, but, respondents also sought relief under state agency law which, they argue, requires consent as well as disclosure. Federal regulations plainly do not require such consent; therefore, given the broad nature of the relief sought, there is still a question of whether a conflict may exist between state requirements and federal regulation.

Schwab asserts that the consent that respondents say state agency law requires is impossible to achieve. Schwab contends that it is impossible to determine the precise amount of money from each order that represents an order flow payment because such payments are made in the aggregate, a few pennies per share on average in a total order of hundreds, thousands or tens of thousands of shares, or are made as non-cash equivalents which may be impossible to associate with individual sales. Therefore, Schwab says, any ruling which implies that the order

flow payments might have to be remitted to the customer on a case-by-case basis would be impossible to fulfill and would require the termination of the practice of order flow payments. Respondents assert, in contrast, that customers could simply consent when they sign their brokerage agreements, for example.

■ Schwab's argument is credible and compelling. Minnesota law requires an agent to act solely for the benefit of his or her principal in all matters connected with the agency. *Doyen v. Bauer*, 211 Minn. 140, 300 N.W. 451 (1941). "[P]rofits made in the course of the agency belong to the principal whether they are the fruits of performance or violation of the agent's duty." *Id.* at 454. An agent may not profit from the relationship nor engage in self-dealing without the principal's consent after full disclosure of facts which might affect the principal's decision. *See Carlson v. Carlson*, 363 N.W.2d 803, 805 (Minn.App.1985); *Handy v. Garmaker*, 324 N.W.2d 168, 173 (Minn.1982). For Schwab to fully comply with these state agency law requirements, it would need to be able to ascertain the exact amounts of these profits in order to seek its clients' consent, or to remit them to its customers if consent were withheld. Since it cannot parse out order flow payments to such a degree, compliance with the potential consent requirements of Minnesota law might put an end to the practice of order flow payments, which is allowed under federal law. Thus, the remedy respondents seek could frustrate the objectives of the SEC and Congress. *See Merrill Lynch*, 414 U.S. at 137, 94 S.Ct. at 394. Congress intended the SEC to regulate the securities markets and industry to encourage competition.

■ We believe that order flow payments are a useful competitive tool and that a decision requiring them to be returned to the customer would have a seriously negative impact on the efficacy of this tool. In turn, given the complicated and intricate nature of the securities industry, anything affecting a practice as widely utilized as this one will

have a significant impact on the securities markets nationwide. Whether this impact will be positive or negative is not for this court to judge. It is sufficient for us to identify the national import and possible effect of our decision and recognize that decisions with such a reach are for the SEC and Congress.[2]

The decision of the court of appeals is reversed and the trial court's grant of summary judgment reinstated.

Reversed.

2. Schwab also raises an argument that this court should defer to the primary jurisdiction of the SEC in this matter. Because our ruling on the preemption question is dispositive of this case, we decline to address the primary jurisdiction issue.