Sixth Division
 December 24, 1996

Nos. 1-94-2277)
 1-94-3423)
 1-94-3424) Cons.

ROBERT ORMAN, on behalf of himself ) Appeal from the
and all similarly situated Schwab ) Circuit Court of
customers, ) Cook County.
 )
 Plaintiff-Appellant, )
 )
 v. ) 
 )
CHARLES SCHWAB & CO., INC., ) Honorable
 ) Edward C. Hofert,
 Defendant-Appellee. ) Judge Presiding.
________________________________________)
 )
GORDON RUBENSTEIN, on behalf of himself )
and all similarly situated Quick & )
Reilly customers, )
 )
 Plaintiff-Appellant, )
 )
 v. ) 
 )
QUICK & REILLY, INC., and U.S. )
CLEARING CORP., ) Honorable
 ) Arthur L. Dunne,
 Defendants-Appellees. ) Judge Presiding.
________________________________________)

LEONARD M. BLAND, on behalf of himself )
and all similarly situated Olde )
Discount Corporation customers, )
 )
 Plaintiff-Appellant, )
 )
 v. ) 
 )
OLDE DISCOUNT CORPORATION, ) Honorable
 ) Arthur L. Dunne,
 Defendant-Appellee. ) Judge Presiding.

 JUSTICE RAKOWSKI delivered the opinion of the court:
 Plaintiffs, Robert Orman, Gordon Rubenstein, and Leonard M.
Bland (Customers) filed complaints against defendants, Charles
Schwab & Co., Quick & Reilly, Inc., and Olde Discount Corporation
(Brokers), respectively, alleging that Brokers violated state
common and statutory law when they conducted stock trades on
behalf of Customers. In particular, the Brokers breached their
fiduciary duties by keeping certain profits (order flow payments)
without adequate disclosure to or authorization from the
Customers. Each suit was dismissed on the Brokers' combination
motions under sections 2-615 and 2-619 of the Code of Civil
Procedure. 735 ILCS 5/2-615 and 5/2-619 (West 1994). The trial
court, in each case, found that the Customers' claims were
preempted by federal law. Plaintiffs appeal contending the trial
courts erroneously held that their actions were preempted. The
cases were consolidated for appeal. 
 The sole issue is whether the Customers' claims based on
state common and statutory law are preempted by the Securities
Exchange Act of 1934 (the Act). 15 U.S.C.  78a et seq. (1994). 
We affirm.
 FACTS
 As stated in the facts by the parties, pursuant to standard
form contracts between the Customers and Brokers, each Broker was
employed to buy and/or sell stocks on the Customers behalf for
which the Broker would received a commission. In such capacity,
the Broker acted as the Customer's agent. When a Customer placed
an order, the Broker could execute it in various markets. The
Broker would contact a market maker of its choice to effectuate
the required trade. The price obtained was negotiated between
the Broker and the market maker. The market maker made a profit
on every trade. To induce Brokers to deal through them, market
makers shared part of their profit with the Broker. This
practice is known as order flow payments. It is a recognized and
widespread practice in the industry and part of the competitive
market. 
 Brokers retained the order flow payments and did not pass
them on to Customers. In their complaints, plaintiffs allege
that the Brokers breached their fiduciary duties by retaining the
payments without adequate disclosure to them or authorization
from them. Subsequent to each transaction, the Broker sent a
confirmation slip to the Customer containing the disclosure
required by the Securities and Exchange Commission (the SEC);
however, the Brokers did not disclose order flow payments.
 Plaintiffs filed suits alleging claims for breach of
fiduciary duty, unjust enrichment, unfair and deceptive business
practices, and breach of contract based on the Brokers retention
of the order flow payments. 
 ANALYSIS
 "The purpose of a motion to dismiss under section 2-619 ***
is to afford litigants a means to dispose of issues of law and
easily proved issues of fact at the outset of a case, reserving
disputed questions of fact for a jury trial." Zedella v. Gibson,
165 Ill. 2d 181, 185 (1995). All well-pleaded facts in the
complaint are admitted but conclusions of law and fact
unsupported by specific allegations are not. Draper v. Frontier
Insurance Co., 265 Ill. App. 3d 739, 742 (1994). The trial court
must construe the motion and supporting documents in the light
most favorable to the nonmovant. Draper, 265 Ill. App. 3d at
742. "Section 2-619(a)(9) allows dismissal when 'the claim
asserted *** is barred by other affirmative matter avoiding the
legal effect of or defeating the claim.' " Zedella, 165 Ill. 2d
at 185. Preemption is an affirmative matter. Russo v. Boland,
103 Ill. App. 3d 905, 909-10 (1982). "The question on appeal is
'whether the existence of a genuine issue of material fact should
have precluded the dismissal, or absent such an issue of fact,
whether dismissal is proper as a matter of law.' " Zedella, 165
Ill. 2d at 185-86. We review the trial court's decision de novo. 
Kedzie & 103rd Currency Exchange, Inc. v. Hodge, 156 Ill. 2d 112,
116 (1993).
 Congress promulgated the Act which created the SEC and
delegated to it the responsibility for oversight of the
securities industry. Federal oversight was designed to: (1)
protect the investing public; (2) remove impediments to smooth
operation of the national market; and (3) impose reporting
requirements that ensure a fair and honest market. Dahl v.
Charles Schwab & Co., 545 N.W.2d 918, 924 (Minn. 1996). In 1977,
the SEC adopted Rule 10b-10 which outlined the necessary
disclosure brokers were required to furnish its clients. 17 CFR
240.10b-10 (1994). Rule 10b-10 mandated brokers to furnish
written notification at or before completion of a transaction
which included: 
 "The source and amount of any other
 remuneration received or to be received by
 him in connection with the transaction:
 Provided, however, *** the written
 notification may state whether any other
 remuneration has been or will be received and
 that the source and amount of such other
 remuneration will be furnished upon written
 request of such customer." 17 CFR 240.10b-
 10(a)(7)(iii) (1994).
Originally, the Rule made no specific reference to order flow
payments.
 The Rule was amended effective October 2, 1995, which added
disclosure requirements concerning order flow payments. The Rule
now states that brokers must provide customers with: "a statement
whether payment for order flow is received by the broker or
dealer for transactions in such securities and that the source
and nature of the compensation received in connection with the
particular transaction will be furnished upon written request of
the customer." 17 CFR 240.10b-10(a)(7)(iii) (1996). This
disclosure must be made to the customer at the time the customer
opens his or her account. 17 CFR 240.11Ac1-3(a) (1996).
 All of the acts giving rise to the instate case occurred
prior to the 1995 amendment.
 Plaintiffs contend the Act does not preempt state regulation
of securities. They argue this is particularly true in light of
section 28(a) which provides that: "[t]he rights and remedies
provided by this title shall be in addition to any and all other
rights and remedies that may exist at law or in equity." 15
U.S.C. 78bb(a) (1994). They further contend that the pre-1995
version of Rule 10b-10 did not encompass order flow payments and
therefore, does not preempt state law.
 The parties submit decisions from four jurisdictions, and
independent research has disclosed no others. Three of the
jurisdictions (New York, Minnesota, and California) find that
federal law preempts state regulation of securities. Only the
federal district courts for Louisiana hold that state claims
based on state laws are not barred. All acts giving rise to each
of these cases occurred prior to the 1995 amendment of Rule 10b-
10, as in the instant case.
 Federal law may preempt state law either expressly or
impliedly. No express preemption exists here. See Dahl, 545
N.W.2d at 923. Thus, if state claims are preempted, it must be
by implication.
 "The United States Supreme Court has
 identified a two-pronged analysis for
 determining whether Congress made such an
 implication [implied preemption]. State law
 is preempted if Congress has entirely
 displaced the possibility of state regulation
 or if state regulation conflicts with federal
 law. [Citation.] The Court has indicated
 that four main considerations are relevant to
 an inquiry into whether Congress has
 impliedly displaced possible state
 regulation: 1) the scheme of federal
 regulation may be so pervasive as to leave no
 room for supplemental state action; 2) the
 federal interest may be so dominant that
 state regulation will be presumptively
 precluded; 3) the objective of the federal
 regulation may reveal a preemptive purpose;
 or 4) the state policy may produce a result
 inconsistent with that federal objective. 
 [Citation.] State law will conflict with
 federal law when 'compliance with both
 federal and state regulations is a physical
 impossibility' or where state law 'stands as
 an obstacle to the accomplishment and
 execution of the full purposes and objectives
 of Congress.'" Dahl, 545 N.W.2d at 924.
 In Guice v. Charles Schwab & Co., No. 200 (N.Y. October 17,
1996), the New York Court of Appeals held that plaintiffs' state
claims were preempted. Plaintiffs argued defendants breached
their fiduciary duties by retaining order flow payments without
adequate disclosure. The court rejected this argument finding
the state claims preempted by the 1975 amendments to the Act as
implemented by SEC regulations. The Guice court determined that
the 1975 amendments granted the SEC authority to shape a new
national market system, gave it power to regulate, and authorized
it to police the new system. One of the goals of the 1975
amendments was to develop a "national market system for security
trading" which was to be policed by a "coherent and national
regulatory structure." The SEC was directed to administered this
structure which it did through regulations. In furtherance of
these goals, in 1977, the SEC adopted Rule 10b-10, a "uniform"
rule for all transactions in the "national market." According to
Guice, the SEC had monitored and studied the securities industry
for years and consistently applied Rule 10b-10 to order flow
payments. The Guice court noted that the SEC amended Rule 10b-10
after recognizing that order flow payments furthered purposes of
Congress "by enhancing more efficient and less costly execution
of customers' orders and by promoting competition." Guice, No.
200, slip op. at 18. Although the amendment occurred after the
facts giving rise to the claims in Guice, the court implied that
this amendment demonstrated the SEC's continued regulation of
order flow payments.
 Guice rejected plaintiffs' argument that section 28(a)
foreclosed preemption of areas other than those explicitly listed
in that section.
 In finding preemption, the court reasoned that state claims
would serve as an obstacle to federal goals and thus, could not
endure. It based its rationale on the legislative history of the
1975 amendments and the SEC's history of regulating order flow
payments. First, the court was:
 "[C]onvinced that permitting the courts of
 each State to enforce [their] common-law
 agency standards of disclosure on the
 practice of order flow payments *** would
 unavoidably result in serious interference
 with the 'accomplishment and execution of the
 full purposes and objectives of Congress'
 [citation], in enacting the 1975 amendments,
 and would directly conflict with SEC
 regulations limiting the disclosure
 requirements regarding receipt of order flow
 payments ***." Guice, No. 200, slip op. at
 16-17.
Likewise:
 "Permitting the courts of each State to
 impose civil liability on national securities
 brokerage firms, ***, for failure to meet
 more stringent common-law agency standards of
 disclosure of receipt of order flow payments
 (rather than the federally-mandated uniform
 specific disclosure ***) would inevitably
 defeat the congressional purpose of enabling
 the SEC to develop and police that 'coherent
 regulatory structure' for a national market
 system." Guice, No. 200, slip op. at 18.
If each state were allowed to specify the nature of disclosure,
brokerage firms would be required to tailor their disclosure
statements to each state's law and the "carefully-crafted SEC
disclosure requirements would have little, if any, influence." 
Guice, No. 200, slip op. at 19. Because the state law would
adversely affect the SEC's ability to regulate uniformly, the
state law was preempted.
 The Guice court also determined the objectives of Congress
would be thwarted in a second way: order flow payments would be
eliminated. "At worst, onerous stricter disclosure costs plus
the threat of lawsuits all around the country, based on breach of
common-law agency relationships, would likely result in many
brokerage firms abandoning acceptance of order flow payments
altogether, an even more drastic undermining of congressional
objectives." Guice, No. 200, slip op. at 20. The SEC clearly
authorizes the use of order flow payments and recognizes its
benefit to the industry. Any activity which defeats this goal is
an obstacle to federal law.
 In sum, the court stated:
 "The stricter standards of order flow payment
 disclosure which may be required under State
 common-law agency principles inevitably will
 supplant the disclosure rules of the SEC on
 the same subject and come to dominate the
 relationship between broker and customer ***
 [thus] upset[ting] the policy-based delicate
 balance Congress directed the SEC to achieve
 in the regulatory regime envisaged under the
 1975 amendments to the Securities Exchange
 Act." Guice, No. 200, slip op. at 21-22.
 In Dahl, 545 N.W.2d 918, the Minnesota Supreme Court ruled
that the SEC rules preempted plaintiffs' state common and
statutory law actions. Before stating its rationale for finding
preemption, the court rejected several of the parties' arguments
which correspond to arguments raised in the instant case. First,
it rejected plaintiffs' argument that only those areas
specifically identified in section 28(a) and no others, were
preempted stating that the savings clause provision in section 28
did "not prevent implied preemption of areas of securities law
not specified in the clause." Dahl, 545 N.W.2d at 923. Second,
it rejected defendants' argument that the pre-1995 version of
Rule 10b-10 expressly preempted state law. The Dahl court stated
that the "SEC *** had no rule in place expressly mentioning order
flow payments." Dahl, 545 N.W.2d at 923. Third, it concluded
that Rule 10b-10 as amended in 1995 did not apply since it was
not in effect at the time the trades giving rise to the claims in
Dahl were conducted.
 The Dahl court found implied preemption based on state laws
being an obstacle to federal goals. Because the securities
industry is not only national, but also international, the Dahl
court asserted that a decision by any particular state court
would reach beyond the state's border. Thus, although it would
be possible for brokers to comply with both state and federal
disclosure regulations, individual disclosure requirements would
frustrate the federal objectives. In Dahl, as in the case before
us, plaintiffs sought to impose a duty upon brokers to either
obtain the consent of the customer to retain order flow payments
prior to a transaction, or to remit the payments to customers. 
Defendants contended, as do they in the instant case, that such a
requirement would in effect lead to the extinction of order flow
payments. The court agreed with defendants. 
 "For Schwab to fully comply with these state
 agency law requirements, it would need to be
 able to ascertain the exact amounts of these
 profits [order flow payments] in order to
 seek its clients' consent, or to remit them
 to its customers if consent were withheld. 
 Since it cannot parse out order flow payments
 to such a degree, compliance with the
 potential consent requirements of Minnesota
 law might put an end to the practice of order
 flow payments, which is allowed under federal
 law. Thus, the remedy [customers] seek could
 frustrate the objectives of the SEC and
 Congress." Dahl, 545 N.W.2d at 925.
 Finally, in McKey v. Charles Schwab & Co., BC139314 (Cal.
Super. Ct. September 10, 1996), and Miller v. Charles Schwab &
Co., BC137133 (Cal. Super. Ct. September 10, 1996), the superior
court of California for Los Angeles County found plaintiffs'
state claims preempted. It too noted that the pre-1995 version
of Rule 10b-10 is part of an "overall regulatory scheme" which
would be frustrated by allowing individual state adjudication of
disclosure requirements. According to this court, "[i]t strikes
the Court as poor public policy to create confusion, by allowing
a proliferation of common law disclosure standards, from
California and presumably 49 other states, in the interest of
protecting an intangible principle of 'better disclosure' where
there is no tangible damage." In sum, the "additional standards
proposed by *** plaintiff[s] would stand as an obstacle to the
federal regulatory scheme."
 Conversely, the federal district courts for both the Eastern
and Western District of Louisiana have held that state claims are
not preempted. Thomas v. Charles Schwab & Co., No. 95-0307 (W.D.
La. July 12, 1995); Dumont v. Charles Schwab & Co., No. 95-0606
(E.D. La. May 4, 1995).
 In Thomas, the court stated "Congress has not expressly
preempted state law and, after a review of the record, this court
finds that congressional intent to preempt state law cannot be
inferred." Thomas, No. 95-0307, slip op. at 3. Thomas concluded
that:
 "[A]dditional disclosure regarding 'amount of
 renumeration' and that 'the renumeration was
 paid by a party whose interests are adverse
 to those of the customer' will not conflict
 with this SEC regulation nor act as an
 obstacle to the protection of a fair
 competitive market and investor interests.
 In addition, defendant has not persuaded
 this court that it was Congress' intent to
 provide comprehensive regulation dealing with
 the disclosure of order flow payments to the
 exclusion of all state laws regarding agency
 and fiduciary duties." Thomas, No. 95-0307,
 slip op. at 4.
 In Dumont, the court determined that section 28(a) neither
expressly preempted state law nor demonstrated a pervasive
federal regulatory scheme. Based on this finding, the court
stated:
 "Where as here, Congress has not
 explicitly or implicitly displaced all state
 regulation in a specified field, preemption
 arises only if compliance with both federal
 and state law is an impossibility or when the
 state law is an obstacle to the
 accomplishment of the purposes of the federal
 scheme. Although applying the Louisiana
 standard of fiduciaries to a national
 brokerage company such as Schwab may require
 a stricter standard of care to its customers,
 the application of Louisiana law does not
 conflict with the SEC's authority and power
 to regulate the securities industry, and
 compliance with both federal regulations and
 the stricter Louisiana standard of care is
 not impossible. Moreover, since greater
 disclosure could benefit the investor, the
 applicable of Louisiana law may indeed serve
 the basic purpose of federal laws and
 regulations. Dumont, No. 95-0606, slip op.
 at ___.
 We find the decisions from New York, Minnesota, and
California persuasive. Each extensively discussed the history
and scheme of the securities market and federal participation in
it. As all of them commented, the securities industry is a
national market which must be regulated uniformly. To allow
plaintiffs' causes of action to survive in the Illinois state
courts, the federal uniformity goal will be frustrated, if not,
destroyed. If different state disclosure requirements must be
met by brokerage firms across the nation, uniformity will not
exist. If uniformity is not to prevail, neither Rule 10b-10 nor
the SEC would serve any function or purpose in regulating
disclosure. Accordingly, the goals of the federal government
would be frustrated. While stricter disclosure requirements may
be advantageous, as Rule 10b-10 now requires, the SEC's amendment
of the Rule demonstrates its intent to regulate the area and to
set forth the necessary disclosure requirements.
 While we agree with Thomas and Dumont that state disclosure
regulations may not directly conflict with federal law, we do not
agree with their conclusions that state law is no obstacle to the
federal goals. Although stricter disclosure may serve the
federal goal of protecting investors, the Dumont court ignores
the fact that the law of Louisiana may be different than the laws
of the 49 other states. It gives no rationale regarding the lack
of uniformity among the states nor the affect different laws
would have on the securities industry. The Thomas court looked
only to and was concerned with the law of Louisiana. 
Additionally, the Thomas court cites no authority in support of
its decision and fails to discuss or even address Rule 10b-10
except in passing. The court in Dumont relied on section 28(a)
with only a brief discussion of Rule 10b-10 and provided little,
if any, basis for its decision. Thus, we find Thomas and Dumont
unconvincing.
 For these reasons and those additional reasons outlined in
Guice and Dahl, we conclude plaintiffs' claims were barred by
federal preemption, thus, defeating them. Consequently, the
trial court properly dismissed plaintiffs' complaints as a matter
of law.
 For the foregoing reasons, the decision of the circuit court
of Cook County is affirmed.
 Affirmed.
 McNAMARA, J., concurs.
 ZWICK, P.J., dissenting.
JUSTICE ZWICK, dissenting:
 The majority concludes that common law agency principles are
implicitly pre-empted by the implementation by the Securities and
Exchange Commission Rule 10b-10. They reach this conclusion by
adopting the sweeping and erroneous premise that "the securities
industry is a national market which must be regulated uniformly."
Slip op. at 15. In my view, the majority has gotten it exactly
backwards. The disclosure by an agent to his principle that he is
earning additional renumeration or a "kickback" does nothing to
interfere with uniform regulation of the securities industry. 
 In passing the securities laws, Congress deliberately created a
dual system of regulation in which both federal and state laws
govern industry participants, so long as state regulation is not
inconsistent with federal law. Merrill Lynch, Pierce, Fenner &
Smith, Inc. v. Ware, 414 U.S. 117, 137, 94 S. Ct. 383, 38 L. Ed. 2d
348 (1973). Section 28(a) of the Exchange Act could not be clearer:
"[t]he rights and remedies provided by this title shall be in
addition to any and all other rights and remedies that may exist at
law or in equity." 15 U.S.C. 78bb(a)(Emphasis added). To this end,
Rule 10b-10 was promulgated by the SEC in 1977 to set forth the
minimum disclosure requirements, not displace those disclosures
required by the common law. 
 Rule 10b-10 is entitled "Confirmation of Transactions" and sets
forth various disclosures that a broker or dealer must make to
customers in writing at or before the completion of certain
transactions. In the release announcing the adoption of the Rule,
the SEC stated in pertinent part:
 "The rule does not attempt to set forth all
 possible categories of material information to
 be disclosed by broker-dealers in connection
 with a particular transaction in securities.
 Rule 10b-10 only mandates the disclosure of
 information which can generally be expected to
 be material. Of course, in particular
 circumstances, additional information may be
 material and disclosure may be required." 
Securities Exchange Act Release No 13,508 [1977-1978 Decisions] Fed.
Sec. L. Rep. (CCH) Par. 81,143, at 87,930 n. 28 (May 5, 1977). Thus,
Rule 10b-10 was never intended to serve as a "safe harbor." 
 Throughout the process of adopting, and then amending, Rule
10b-10, the Securities and Exchange Commission has maintained the
position that additional disclosure beyond the SEC rules may be
required. See e.g., Ettinger v. Merrill Lynch, Pierce, Fenner &
Smith, 835 F.2d 1031, 1035 (3rd Cir. 1987). Although the SEC
ultimately adopted a safe harbor for brokers and dealers in Rule
11Ac1-3 (17 C.F.R.  240.11Ac1-3), which provides a mechanism
pursuant to which brokers and dealers can effectively disclose
payment for order flow concerns to customers prior to the
establishment of a agent/principal relationship, it is important to
keep in mind that this new Rule was not in effect at the time the
transactions now at issue took place. Rule 11Ac1-3, therefore, is
simply not relevant to the plaintiffs' claims or to our preemption
analysis.
 If the allegations of plaintiffs' complaint are taken as true,
as they must be at this stage of the proceedings, it is clear that
the plaintiffs have alleged a valid cause of action. This case is
indistinguishable from Janes v. First Federal Savings and Loan
Ass'n, 57 Ill. 2d 398, 312 N.E.2d 605 (1974), in which a lender that
obtained title insurance for its customers and then received rebates
from the title company for sending it the business was held to have
a fiduciary duty to pass the rebate money on to the customers. The
supreme court noted that, "[u]nless otherwise agreed, an agent who
makes a profit in connection with transactions conducted by him on
behalf of the principal is under a duty to give such profit to the
principal." Janes, 57 Ill. 2d at 410, quoting Restatement (Second)
of Agency,  388. There are any number of similar opinions, from
Illinois as well as from other jurisdictions, stating this same
long-standing and fundamental agency principle.
 The prior disclosures required by the common law for an agent
to keep the type of "kickbacks" that order flow payments represent
in no way represents an obstacle to the federal goal of establishing
an efficient and equitable national market. If brokers and dealers
wish to earn a profit in executing their clients orders in addition
to their bargained-for commissions, all that the common law requires
is for brokers and dealers to disclose this additional renumeration
prior to entering into the agency relationship with their clients,
as Rule 11Ac1-3 now contemplates. In that they hold otherwise, the
cases relied upon by the majority are wrongly decided.
 The Guice court reasoned that since the 1975 amendments to the
Securities Exchange Act were designed, in part, to create a
"uniform" national market, the SEC must have intended to promote a
"uniform" rule for order flow payments when it promulgated Rule 10b-
10 in 1977. Yet my research indicates that payment for order flow is
a fairly recent practice which grew up after the SEC's promulgation
of Rule 10b-10 in 1977. Order flow payments appear to have first
come to the attention of the news media and the National Association
of Securities Dealers only in 1985. See Note, The Perils of Payment
for Order Flow, 107 Harv. L.Rev. 1675, 1676, fn. 8 (1994); Jane
Sasseen, Dirty Little Secret, Forbes, June 17, 1985, at 203. It
follows that payment for order flow by brokers could not have been
contemplated or specifically regulated in 1977 by Rule 10b-10 when
the SEC promulgated the rule. It is not surprising, therefore, that
the 1976 SEC release asking for public comment on then proposed Rule
10b-10 does not mention payment for order flow. Instead, the release
explains that the proposed rule is designed to deal with a quite
different problem, namely, "with agency crosses in the over-the-
counter market where the broker acts as agent for both the buyer and
the seller." SEC Proposed Rulemaking, Exchange Act Release No. 12806
(Sept. 16, 1976) (Emphasis added.) Similarly, the 1977 SEC release
which accompanied the final rule discusses how the rule would be
applied when a brokerage firm represents the buyer and seller in the
same transaction. Exchange Act Release No. 13508 (May 5, 1977). 
 The Minnesota Supreme Court's recent opinion in Dahl is no more
compelling. The Dahl court concludes that, "For [defendant] Schwab
to fully comply with these state agency law requirements, it would
need to be able to ascertain the exact amounts of these profits in
order to seek its clients' consent, or to remit them to its
customers if consent were withheld." Dahl, 545 N.W.2d at 925. This
conclusion is unsupported by agency law, logic or the record in our
case.
 An agency is a consensual relationship. State Security
Insurance Co. v. Frank B. Hall & Co., 258 Ill.App.3d 588, 595, 630
N.E.2d 940 (1994). As such, the relationship can be modified by
mutual agreement as the parties see fit. All the defendants need
have done to comply with the common law is to have informed their
clients that, as a condition of accepting client business, the
defendants would insist on retaining any order flow payments
received in connection with the execution of client orders.
Defendants elected not to do so. If the defendants now believe they
have an onerous obligation under the common law to refund order flow
payments, I can only conclude that they have brought this obligation
upon themselves by not fully informing their clients of the true
nature of their renumeration.
 For the above reasons, I respectfully dissent.