Docket No. 82697–Agenda 26–September 1997.

ROBERT ORMAN 
et al
., Appellants, v. CHARLES SCHWAB & COMPANY, INC., 
et al.
, Appellees.

Opinion filed November 20, 1997.

JUSTICE HEIPLE delivered the opinion of the court:

At issue is whether Illinois breach of fiduciary duty and breach of contract claims arising out of a broker's retention of order flow payments are implicitly preempted because such claims would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the Securities Exchange Act of 1934 (15 U.S.C. §78a 
et seq
. (1994)). The plaintiffs in the three class action lawsuits consolidated for review sued the broker-defendants for retaining order flow payments, which they contend runs afoul of Illinois agency law. The trial court granted defendants' motions to dismiss plaintiffs' complaints on the ground that their claims were preempted by the Securities & Exchange Act of 1934, and the appellate court affirmed (285 Ill. App. 3d 937). This court allowed plaintiffs' petition for leave to appeal (166 Ill. 2d R. 315). For the reasons expressed below, we affirm.

ANALYSIS

The plaintiffs in these consolidated class actions assert the rights of a putative nationwide class of customers of defendants, Charles Schwab & Company, Inc., Quick and Reilly, Inc., and Olde Discount Corporation, discount securities brokerage firms which plaintiffs retained to execute their securities transactions. The gravamen of plaintiffs' complaints is that the defendants violated Illinois agency and/or contract law when they failed to remit to plaintiffs order flow payments received in executing plaintiffs' securities transactions. Order flow payments consist of both monetary and nonmonetary remuneration paid to a dealer by a market maker in exchange for the dealer's routing a customer's orders through the market maker. As plaintiffs observe, brokers are their customers' agents and as such owe them certain fiduciary duties. See 
Martin v. Heinold Commodities, Inc.
, 117 Ill. 2d 67, 76-77 (1987). Under traditional agency law, an agent who makes a profit in connection with transactions conducted on behalf of the principal is under a duty to remit that profit to the principal absent an agreement to the contrary. 
Janes v. First Federal Savings & Loan Ass'n
, 57 Ill. 2d 398, 410 (1974), quoting Restatement (Second) of Agency §388 (1958). Plaintiffs' complaints allege breach of fiduciary duty and breach of contract premised upon defendants' failure to remit the order flow payments they received to the plaintiffs.
(footnote: 1)
Defendants counter that the Securities Exchange Act of 1934 (Exchange Act) (15 U.S.C. §78a 
et seq
. (1994)) implicitly preempts plaintiffs' state-law claims. The preemption doctrine is rooted in the supremacy clause of the United States Constitution, which mandates that “the Laws of the United States *** shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const., art. VI, cl. 2. An act of Congress or regulatory law promulgated thereunder may supersede the statutory, regulatory or common law of any state where such “[is] the clear and manifest purpose of Congress.” 
Cipollone v. Liggett Group, Inc.
, 505 U.S. 504, 516, 20 L. Ed. 2d 407, 422, 112 S. Ct. 2608, 2617, quoting 
Rice v. Santa Fe Elevator Corp.
, 31 U.S. 218, 230, 91 L. Ed. 1447, 1459, 67 S. Ct. 1146, 1152 (1947). A congressional act can either expressly or implicitly preempt a state cause of action. 
Freightliner Corp. v. Myrick
, 514 U.S. 280, 287, 131 L. Ed. 2d 385, 392, 115 S. Ct. 1483, 1487 (1995). Here defendants urge that plaintiffs' state claims relating to order flow payments are implicitly preempted by the Exchange Act because they “stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,” as manifested in the language, structure and underlying goals of the statute at issue. See 
Hines v. Davidowitz
, 312 U.S. 52, 67-68, 85 L. Ed. 581, 587, 61 S. Ct. 399, 404 (1941).

Determining whether plaintiffs' state-law claims are implicitly preempted by the Exchange Act requires an understanding of the Exchange Act's history and the evolution of order flow payments. Congress enacted the Exchange Act in 1934 to regulate the various aspects of the securities industry; its implementing agency, the Securities and Exchange Commission (SEC), is responsible for adopting regulations which foster capital formation, facilitate competition and protect investors in the vastly complex array of markets that constitute the securities industry. Congress subsequently enacted amendments to the Exchange Act in 1975 (1975 Amendments) to cure “the securities industry's languor in the face of great changes and opportunities.” S. Rep. No. 94–75, at 1, 
reprinted in
 1975 U.S.C.C.A.N. 179, 180. Concerned with the misallocation of capital, widespread inefficiencies, and undesirable and potentially harmful fragmentation of trading (S. Rep. No. 94–75, at 1, 
reprinted in
 1975 U.S.C.C.A.N. 179, 180), the 1975 Amendments called upon the SEC to develop a “National Market System” which would facilitate the “economically efficient execution of securities transactions” and “fair competition among brokers and dealers, among exchange markets, and between exchange markets and markets other than exchange markets.” 15 U.S.C. §§78k–1(a)(1)(C)(i), (a)(1)(c)(ii) (1994).

The SEC's responsibilities included implementing regulations to “assure the prompt, accurate, reliable, and fair collection *** [and] distribution *** of information with respect to *** transactions in such securities and the fairness and usefulness of the form and content of such information.” 15 U.S.C. §78k–1(c)(1)(B) (1994). In 1977, the SEC exercised its authority and adopted Rule 10b–10, a “uniform rule applicable to all who wish to effect transactions for or with investors” which “adjust[ed] regulatory requirements to eliminate those for which compliance costs appear to be disproportionate to the practical benefits of investor protection thereby obtained.” (Securities Confirmations Proposed Rule, SEC Exchange Act Release No. 12806, 
reprinted in
 41 Fed. Reg. 41,432, 41,432 (1977)). In pertinent part, Rule 10b–10 required that a broker-dealer disclose on a customer's confirmation statement “whether any other remuneration has been or will be received and that the source and amount of such other remunerations will be furnished upon written request.” 17 C.F.R. §240.10b–10(a)(7)(iv) (1997). Rule 10b–10 was in addition to section 28(a) of the 1975 Amendments, which provided in pertinent part:

“The rights and remedies provided by this chapter shall be in addition to any and all other rights that may exist at law or in equity ***. Nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any state over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder.” 15 U.S.C. §78bb(a) (1994).

Thus Congress and the SEC achieved the appropriate balance between necessary regulation and free market forces in advancing the National Market System.

Substantively, the 1975 Amendments contained a variety of provisions intended to increase the number of market participants, develop competitors to the traditional stock exchanges and utilize emerging technology to increase competition between the exchanges and market makers for retail customer order flow. Market 2000: An Examination of Current Equity Market Developments, Market Regulation Division, Securities and Exchange Commission 5-6 (1994). It was hoped that “[i]f market makers in a particular market center have reasonable expectations that they will receive a greater amount of [customer] order flow if they make markets which are consistently better in terms of price, depth or ease of execution *** they will be more likely to compete aggressively thereby providing a better and more efficient” National Market System. Development of a National Market System, Exchange Act Release No. 34–15671, Fed. Sec. L. Rep. (CCH) par. 81,572 (1979). Toward this end, the 1975 Amendments abolished fixed commission rates in order to increase competition within and between securities markets. See 15 U.S.C. §78(e)(1) (1994).

The 1975 Amendments have been successful, prompting market makers to develop and utilize nontraditional markets such as the over-the-counter (OTC) market and the NASDAQ to effectuate trades, which has in turn has increased customer options with respect to how and at what prices they trade securities. Integral to the market makers' ability to attract steady streams of customer order flow for traditional and nontraditional markets has been the practice of paying “order flow payments.” Generally speaking, payment for order flow is the practice of market makers or exchange specialists compensating brokerage firms for directing customer orders to them for execution. The order flow payment practice evolved in the early 1980s and typically includes both monetary and nonmonetary remuneration to broker-dealers in exchange for their routing their customers' transactions through the market makers.
(footnote: 2) When the practice of order flow payments evolved, the National Association of Securities Dealers took the position that the practice was governed by Rule 10b-10, the 1977 all-purpose provision requiring that broker-dealers disclose on a customer's confirmation statement whether any other remuneration has been or will be received and that the source and amount of such other remunerations will be furnished upon written request. 17 C.F.R. §240.10b–10(a)(7)(iv) (1997). See, 
e.g
., National Association of Securities Dealers Notice to Members, NTM No. 85–32 (1985) (Rule 10b–10 applies to “payments received by a retail firm from a market maker in return for their directing order flow to the market maker”).

As evidenced by the instant plaintiffs' persistent references to order flow payments as “kickbacks,” the practice has its detractors. See generally Note, 
The Perils of Payment for Order Flow
, 107 Harv. L. Rev. 1675 (May 1994). The SEC, sensitive to the various concerns raised by the practice, has studied its impact on both markets and consumers since as early as 1984. See SEC Release No. 34–33026, 
reprinted in
 58 Fed. Reg. 52,934, 52,935 (1993). After a thorough and comprehensive study of order flow payments, with input from participants industrywide, the SEC acknowledged arguments that order flow payments produced economic benefits to customers, including: (1) lower unit costs; (2) increased retail brokerage firm revenue; (3) lowered commissions; (4) more expeditious executions; (5) enhanced customer services; (6) increased competition from automated execution systems and related practices; (7) increased competition between wholesale dealers and exchanges and vertically integrated firms; and (8) reduced execution costs in all markets, including the exchanges. SEC Release No. 34–33026, 
reprinted in
 58 Fed. Reg. at 52,939-40 (1993). Notwithstanding the far-reaching benefits identified, the SEC also recognized that order flow payments raise concerns as to whether the customer is being treated fairly. Payment for Order Flow, SEC Release No. 34–3026, at 24-26, 
reprinted in
 59 Fed. Reg. 55,006 (1994).

Accordingly, in 1994 the SEC struck a deliberate balance: formulating disclosure requirements that provide investors with relevant, important information at key points, while at the same time avoiding impractical and burdensome disclosure requirements that might compromise the contributions of the practice to market competition. Specifically, on October 24, 1994, the SEC promulgated an amendment to Rule 10b–10 which, in pertinent part, added paragraph (9)(e), which defined order flow payments, and subparagraph (a)(7)(iii), which required disclosure of order flow at time of confirmation. In addition, the SEC promulgated Rule 11Acl–3, which required disclosure of the practice of order flow payments at the time an account is opened and annually thereafter. SEC Release No. 34–34902, 
reprinted in
 59 Fed. Reg. 55,006, 55,007-11 (1994). Finally, the SEC delayed implementation of the new rules “to provide firms with four months to make the necessary systems and forms changes to prepare for the implementation”; this initial four-month “safe harbor” was extended an additional seven months until October of 1995 in further acknowledgment of the complex system changes that the additional disclosure rules necessitated. See Payment for Order Flow, SEC Release No. 35473, Fed. Sec. L. Rep. (CCH) par. 85,606, at 86,410 (March 10, 1995).

Significantly, the SEC rejected proposals that order flow payments be passed through to the customers. SEC Release No. 34–34902, 
reprinted in
 59 Fed. Reg. at 55,011 n.42 (1994). Moreover, the SEC likewise rejected as unworkable its initial proposal that brokers disclose the 
amount
 of remuneration received in exchange for order flow. SEC Release No. 34–34902, 
reprinted in
 59 Fed. Reg. at 55,010 n.39 (1994).

The order flow payments at issue in plaintiffs' complaints all took place prior to the SEC's 1994 promulgation of the Rule 10b–10 amendments and Rule 11Acl–3. Plaintiffs contend defendants are liable to them under state agency law notwithstanding that defendants complied with the 1977 version of Rule 10b–10 by providing plaintiffs with confirmation slips apprising them that remuneration may have been received from the brokers through whom their transactions were executed and that, upon request, the amounts would be disclosed. Plaintiffs argue that defendants' compliance with Rule 10b–10 cannot be invoked to preempt their state-law claims because the practice of order flow payments was not even in existence at the time the rule was promulgated. Additionally, plaintiffs observe that Rule 10b–10 was not intended as a safe harbor against state laws which exceeded its requirements; rather, Rule 10b–10 was intended to prescribe only minimum disclosure obligations. 
Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.
, 835 F.2d 1031, 1034 (3d Cir. 1987), quoting Securities Exchange Act Release No. 13,508, Fed. Sec. L. Rep. (CCH) par. 81,143, at 87,930 n.28 (“ `[t]he rule does not attempt to set forth all possible categories of material information to be disclosed by broker-dealers in connection with a particular transaction in securities' ”). Accordingly, plaintiffs contend that additional disclosure requirements that complement Rule 10b–10 and provide added security to customers are entirely consistent therewith and are not preempted. 
Cf. CTS Corp. v. Dynamics Corp. of America
, 481 U.S. 69, 77, 95 L. Ed. 2d 67, 77, 107 S. Ct. 1637, 1643 (1987) (Indiana statute containing stricter takeover requirements did not conflict with the Williams Act); 
American Airlines, Inc. v. Wolens
, 513 U.S. 219, 130 L. Ed. 2d 715, 115 S. Ct. 817 (1995) (establishing that a plaintiff may pursue a breach of contract claim against airline despite the existence of a comprehensive federal regulatory scheme governing the industry).

Though plaintiffs are correct that the practice of order flow payments had not commenced until several years after Rule 10b–10 was adopted, it nevertheless remains true that Rule 10b–10 is of general application and clearly encompassed the practice when it evolved. Rule 10b–10 required brokers to include on a customer's confirmation statement whether any other remuneration has been or will be received and that the source and amount of such other remunerations will be furnished upon written request. 17 C.F.R. §240.10b–10(a)(7)(iv) (1997). Order flow payments are “other remuneration” and as such are governed by Rule 10b–10. Equally unavailing is plaintiffs' observation that Rule 10b–10 sets forth only minimum guidelines and was not intended as a safe harbor for those who do not meet more rigorous state disclosure laws. The preemption issue at bar must be decided upon careful consideration of congressional and SEC intent, of which Rule 10b–10 is only a partial manifestation.

Similarly inconclusive is plaintiffs' reliance on section 28(a) of the Exchange Act as evidence of Congress' intention to permit their state causes of action. Section 28(a) provides:

“The rights and remedies provided by this chapter shall be in addition to any and all other rights that may exist at law or in equity ***. Nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any state over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder.” 15 U.S.C. §78bb(a) (1994).

Because section 28(a) expressly acknowledges that state and federal securities laws may coexist, and further that no provision of the Exchange Act or the SEC's implementing regulations expressly prohibit application of state agency law to broker-customer relationships, plaintiffs contend there can be no implicit preemption. See 
Leroy v. Great Western United Corp.
, 443 U.S. 173, 182, 61 L. Ed. 2d 464, 473, 99 S. Ct. 2710, 2716 (1979) (section 28(a) was intended to protect, rather than limit, state authority); 
Matsushita Electric Industrial Co. v. Epstein
, 516 U.S. ___, 134 L. Ed. 2d 6, 116 S. Ct. 873 (1996) (Congress contemplated the possibility of dual litigation in state and federal courts related to securities transactions). Section 28(a), however, is of little assistance in determining whether plaintiffs' state causes of action are preempted. For while it admittedly permits “the jurisdiction of the securities commission (or any agency or officer performing like functions) of any state over any security or any person,” it does so only “
insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder.”
 (Emphasis added.) 15 U.S.C. §78bb(a) (1994). As the Supreme Court elucidated in 
Freightliner Corp. v. Myrick
, 514 U.S. at 288-89, 131 L. Ed. 2d at 393, 115 S. Ct. at 1488, a statutory preemption clause which preempts state laws that conflict with the federal law, but which also preserves nonconflicting state laws, does not foreclose the possibility of implied preemption. Even in such a situation, preemption may result where the state law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,” as manifested in the language, structure and underlying goals of the statute at issue. See 
Hines v. Davidowitz
, 312 U.S. 52, 67-68, 85 L. Ed. 581, 587, 61 S. Ct. 399, 404 (1941).

 Thus we consider Congress' intent, as manifested both by the Exchange Act and the SEC rules and regulations promulgated thereunder. As detailed above, Congress enacted the 1975 amendments to the Exchange Act to counteract the languor of the then-existing securities industry and foster a new National Market System characterized by a more “economically efficient execution of securities transactions” and increased competition among all securities industry participants, including “between exchange markets and markets other than exchange markets.” Pub. L. No. 94–29, §7, 89 Stat. 97, 111-12 (1975); 15 U.S.C. §78k–1(c)(1)(B) (1994). This new market system was intended to address the malaise Congress perceived was emanating from lack of competition in the securities industry–an affliction Congress sought to correct in advance of technological innovations it correctly anticipated would radically alter the securities industry, both nationally and internationally.

Throughout the 1980s and 1990s, the SEC studied order flow payments at length and determined, 
inter alia
, that the practice had fueled the growth of nontraditional markets which had in turn led to industrywide reductions in commission rates, faster trade executions and enhanced services. Payment for Order Flow, SEC Release No. 34–3026, at 24-26 (1993). Nor can the impact of these nontraditional markets be overstated: from 1978 to 1992, the percentage of consolidated tape trades in NYSE stocks executed by the NYSE declined from 85.99% to 65.17%, while the percentage executed by the regional exchanges and NASDAQ climbed from 11.55% to 24.22%, and 2.39% to 10.57%, respectively. Market 2000: An Examination of Current Equity Market Developments, Market Regulation Division, Securities and Exchange Commission, Ex. 18 (1994).

In 1994, after much deliberation, the SEC amended Rule 10b–10 and promulgated Rule 11Acl–3 to specifically address the practice of order flow payments. It thereby required that brokers apprise customers whether they engage in order flow payment practices at the time the account is first established and annually thereafter. Additionally, the confirmation slips must advise the customer that order flow payments were received in the course of effectuating a transaction and further advise the customer that, upon request, the 
nature
 of the remuneration will be disclosed. After careful study, the SEC determined that these disclosure requirements struck the appropriate balance between the need to protect consumers and the need to facilitate the increased competition and reduced commissions brought about by the practice of order flow payments.

Regarding the scope of the SEC's disclosure rules vis-a-vis the instant plaintiffs' state-law claims, the SEC's refusal to require brokers to pass through to customers or even disclose the 
amount
 of order flow remuneration in its 1994 disclosure promulgations is significant. See SEC Release No. 34–34902, 
reprinted in
 59 Fed. Reg. at 55,010 n.39, 55,011 n.42 (1994). The SEC concluded that either requirement would be unworkable because a wide array of formulas are used in calculating order flow payments, many of which would be near impossible to apportion on an individual account basis; moreover, there are a variety of nonmonetary remunerations which, though their nature must be disclosed upon request, are not easily valued monetarily. Requiring such would effectively bring the practice of order flow payments to a halt, jeopardizing all direct and indirect benefits attributable to the practice. This the SEC refused to do.

Yet this is exactly what plaintiffs urge this court to sanction. Allowing plaintiffs to advance their breach of fiduciary duty and contract claims would require the defendants to identify the nature and calculate the value of order flow payments received so that plaintiffs' damages (the improperly retained order flow payments) could be assessed. Though the 1994 amendments were not in effect when the defendants retained the order flow payments at issue, we believe these amendments are nevertheless instructive as to the scope of the 1977 version of Rule 10b–10. The deleterious effects to the National Market System that the SEC's 1994 amendments sought to avoid in allowing brokers to retain order flow payments and limiting the order flow disclosure requirements were no less a possibility prior to 1994, when the old Rule 10b–10 applied. Because the purposes and objectives of Congress in enacting the 1975 amendments to the Exchange Act, as well as those of the SEC in promulgating Rule 10b–10 in 1977, have remained constant, we believe what would be deleterious today would have been deleterious throughout the as-yet brief history of the National Market System. And, indeed, we observe that the high courts of New York (
Guice v. Charles Schwab & Co.
, 89 N.Y.2d 31, 674 N.E.2d 282, 651 N.Y.S.2d 352 (1996)) and Minnesota (
Dahl v. Charles Schwab & Co.
, 545 N.W.2d 918 (Minn. 1996)) have so held, finding that claims substantially similar to the ones advanced by the instant plaintiffs are implicitly preempted because they interfere with goals of the Exchange Act. But see 
Thomas v. Charles Schwab & Co.
, No. 95–0307 (W.D. La. July 12, 1995); 
Dumont v. Charles Schwab & Co.
, No. 95–0606 (E.D. La. May 3, 1995) (ruling that similar claims are not preempted).

The supremacy clause requires that state law yield where it “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,” as manifested in the language, structure and underlying goals of the statute at issue. See 
Hines v. Davidowitz
, 312 U.S. 52, 67-68, 85 L. Ed. 581, 587, 61 S. Ct. 399, 404 (1941). Given the history and purpose of Congress' 1975 amendments to the Exchange Act as well as the SEC's implementing regulations vis-a-vis order flow payment disclosures, we are convinced that allowing plaintiffs' related state claims to advance would obstruct the National Market System that Congress intended to foster in enacting the 1975 Amendments. Accordingly, we affirm the judgment of the appellate court.

Appellate court judgment affirmed.

FOOTNOTES
1:
At oral argument, plaintiffs claimed for the first time that one or more of the defendants may not have complied with Securities and Exchange Commission Rule 10b–10. 17 C.F.R. §240.10b–10(a)(7)(iv) (1997). Insofar as this issue was not raised in the lower court proceedings, or briefed before this court, it is waived.

2:
Examples of order flow payments include: cash payments; reciprocal order-routing relationships; discounts; credit; and free services such as access to industry analysts’ reports; accommodation and adjustments of trading errors; access to specialists proprietary order flow; reduced clearing charges; and participation in public offerings. Inducements for Order Flow, A Report to the Board of Governors, National Association of Securities Dealers, Inc., 15-20 (1991).