717 So.2d 1182 (1998)
Gordon DUMONT
v.
CHARLES SCHWAB & CO., INC.
Nos. 96-C-2685, 97-CA-1225.
Court of Appeal of Louisiana, Fourth Circuit.
April 8, 1998.
Amending Decision on Limited Grant of Rehearing May 4, 1998.
Henry C. Gahagan, Jr., Gahagan & Conlay, Natchitoches, and Ewell E. Eagan, Jr., Donna Phillips Currault, Tina C. Santopadre, Gordon, Arata, McCollam & Duplantis, L.L.P., New Orleans, for Defendant/Relator Charles Schwab & Co., Inc.
Randall A. Smith, Gladstone N. Jones, III, Andrew L. Kramer, Smith, Jones & Fawer, L.L.P., New Orleans, and Allan Kanner, Conlee Schell Whiteley, Elizabeth B. Cowan, Allan Kanner & Associates, P.C., New Orleans, and Mark Reinhardt, Cavin S. Wilkinson, Reinhardt & Anderson, Saint Paul, MN and Karl Cambronne, Chestnut & Brooks Minneapolis, MN and Jonathan B. Andry, Gilbert V. Andry, IV, New Orleans, and Daniel Harris, Law Office of Daniel Harris, Chicago, IL, for Plaintiff/Respondent Gordon Dumont.
Before KLEES, LOBRANO and MURRAY, JJ.
MURRAY, Judge.
This matter is before us to review the trial court's judgment overruling an exception of no cause of action and denying a motion for summary judgment, which had been urged in the alternative. In these pleadings, Charles Schwab & Co., Inc., a national stock brokerage firm, argued that because federal regulations governed the activities at issue in this suit, the state law claims asserted in the petition are barred by *1183 the doctrine of preemption. Although this court originally declined to exercise its supervisory jurisdiction to review the trial court's ruling, the Louisiana Supreme Court remanded the defendant's writ application "for briefing, argument and opinion in light of the recent development in the law on the preemption issue." Dumont v. Charles Schwab & Co., Inc., 97-0478 (La.5/1/97), 693 So.2d 750.
For the reasons that follow, we find that the claims asserted here were expressly preempted by SEC Rule 10b-10 during the applicable time period. Accordingly, the judgment below must be reversed and the plaintiff's claims dismissed.
In this class action, Gordon Dumont alleges that from 1985 to 1995, Schwab executed stock transactions as agent for himself and other customers, but received and retained additional payments from wholesale stock dealers without the customers' knowledge or consent. These "order flow payments," generally a few cents per share, were made to induce Schwab to route an increased volume of transactions to a particular wholesaler. The amount of the payments were calculated based upon the customer's price, but the payments were not reflected on the confirmation slip subsequently issued to the customer. For example, a stock purchase might be confirmed at $10.00 per share plus Schwab's commission on the transaction, although the actual price paid by Schwab, after receipt of the order flow payment, would be $9.98. Mr. Dumont asserts that it was this potential profit, derived from these order flow payments, rather than an effort to obtain the best price for each customer, that influenced Schwab's routing of stock trades.
Mr. Dumont acknowledges that Schwab's customers agreed to pay a commission on each transaction. However, because the order flow payments were not disclosed to them, he asserts that Schwab's customers did not consent to pay or receive a price for stock that differed from that paid or received by Schwab. Mr. Dumont contends that the receipt and retention of these payments by Schwab is a breach of several duties it owed to its customers as their agent or mandatary under Articles 3002-15[1] of the Louisiana Civil Code. These include: the duty to disclose all facts material to the representation; the duty to act in the principal's best interests rather than its own; and the duty to turn over all remuneration derived from the representation without the principal's consent.[2] Mr. Dumont seeks an accounting, damages equal to the amount of order flow payments received in connection with transactions executed on behalf of the class, and attorney fees and costs incurred in prosecuting this action.
Although Schwab admits that it received order flow payments "in accordance with industry custom and practice" during the period in question, it asserts that it advised each customer that the firm received "other remuneration" in connection with the transaction and that more information would be furnished upon request. Schwab argues that this disclosure was all that was required by it prior to 1995 under SEC Rule 10b-10, codified at 17 C.F.R. § 240.10b-10, so that all causes of action asserted in this case are barred by the doctrine of preemption.
Under the Supremacy Clause of Article VI of the U.S. Constitution, enforcement of state law may be preempted by federal provisions if the Congress has either enacted a clear expression of that intent or it has legislated so comprehensively in a field that no room is left for state regulation. Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 698-99, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984). Preemption will also be found if it is impossible to comply with both the federal and state provisions, or when application of state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id., quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Where Congress creates an administrative agency to effectuate its statutory goals, those regulations issued within the legislative grant of authority may have the same preemptive effect *1184 as federal statutes. United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961).
The matters at issue here are generally provided for in the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. This Act specifies that "[t]he rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity ... insofar as it does not conflict with [these] provisions ... or the rules and regulations thereunder." 15 U.S.C. § 78bb(a) (emphasis added). In 1975, in conjunction with other amendments intended "to remove impediments to and perfect the mechanisms of a national market system for securities," 15 U.S.C. § 78b, Congress added subsections (c) through (e) to § 78bb, specifying certain areas in which the application of state law would henceforth be limited.
Schwab acknowledges that there is no express legislative preemption in the original enactment of § 78bb, quoted above. It also does not argue that its receipt and/or disclosure of order flow payments falls within the specific areas of preemption added to the Act in 1975. It asserts instead that enforcement of differing state standards for a broker-dealer's[3] disclosure would fragment the securities market, a result that would be contrary to the 1975 legislative directive to the SEC to "use its authority ... to facilitate the establishment of a national market system," that prompted the adoption of Rule 10b-10. Schwab maintains, therefore, that state regulation in this area is preempted implicitly.
Schwab notes that a large number of state courts have found claims similar to those asserted here to be implicitly preempted by SEC Rule 10b-10, i.e., Orman v. Charles Schwab & Co., Inc., 179 Ill.2d 282, 227 Ill. Dec. 927, 688 N.E.2d 620 (1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1518, 140 L.Ed.2d 670 (1998); Shulick v. PaineWebber, Inc., 700 A.2d 534 (Pa.Super.1997); Eirman v. Olde Discount Corp., 697 So.2d 865 (Fla. Dist.Ct.App.1997), certification denied (Aug. 28, 1997); Guice v. Charles Schwab & Co., Inc., 89 N.Y.2d 31, 651 N.Y.S.2d 352, 674 N.E.2d 282 (1996), cert. denied, ___ U.S. ___, 117 S.Ct. 1250, 137 L.Ed.2d 331 (1997); Dahl v. Charles Schwab & Co., Inc., 545 N.W.2d 918 (Minn.), cert. denied, ___ U.S. ___, 117 S.Ct. 176, 136 L.Ed.2d 116 (1996).
We note that those decisions emphasize the adverse market effects if each of the fifty states is permitted to impose a different standard of conduct on broker-dealers acting in an agency capacity. However, we have been provided with no examples of the differences that exist between Louisiana law and that of other states, either in regard to general agency principles or to those specific duties at issue here. Our review of the jurisprudence of the other states, cited above, reveals no material disparities in the duties owed by an agent under the factual allegations asserted here. We are thus reminded that "[t]o invoke the concept of `uniformity'... is not to prove its need." Atherton v. FDIC, 519 U.S. 213, ___, 117 S.Ct. 666, 671, 136 L.Ed.2d 656 (1997) (citations omitted). The question presented is not whether a majority of courts finds that a uniform standard of disclosure is necessary or even beneficial, but whether Rule 10b-10 was adopted by the SEC with the intent to supplant the applicable state law principles of agency, as Schwab contends.
Equally unpersuasive is the argument, adopted to varying degrees by other state courts, that implicit preemption of these claims is indicated by the 1995 implementation of SEC rules specifically regulating the disclosure of order flow payments. The legal demands asserted in this case arise solely from Schwab's practices from February 1985 to February 1995, prior to the adoption of any express federal regulation of payments for order flow. The general disclosure provisions of Rule 10b-10 were originally proposed in 1976, well before payments of this type became a widespread phenomenon. Exchange Act Release 34-33026 (Oct. 6, 1993), 58 Fed.Reg. 52934, 52936 (Oct. 13, 1993). The National Association of Securities Dealers, Inc. (NASD), a self-regulatory organization of which Schwab is a member, *1185 decided as early as 1985 that order flow payments were "other remuneration" that must be disclosed under Rule 10b-10, but it acknowledged in a 1991 report that some commentators believed "that the Securities and Exchange Commission ... should address the issue by rulemaking." Inducements for Order Flow, A Report to the Board of Governors, Nat'l Ass'n of Securities Dealers, Inc., p. 4 (July 1991). It thus appears that while Rule 10b-10 was interpreted by some to govern the disclosure of order flow payments, the extent of regulation intended by the SEC was not clear to all in the industry. Even after this call for clarification, the regulations were not revised until there had been a comprehensive study and the solicitation of comments from industry participants and the public.
Effective October 1995, SEC regulations now expressly require disclosure of payments for order flow at the time an account is opened, on annual statements, and on the confirmations for each transaction. 17 C.F.R. § 240.11Ac1-3(a); 17 C.F.R. § 240.10b-10(a)(7)(9). This after-the-fact revision does not establish that in 1977 the SEC intended Rule 10b-10 to provide the sole source of authority for determining the scope of a broker-dealer's duty to individual customers. In fact, the SEC's ultimate response to the practice of accepting cash payments for order flow was to impose on Schwab and other brokers the duty to disclose, at the beginning of the relationship, that additional compensation would be received by the broker based upon the volume of transactions it routed to particular wholesale dealers. This is the same duty that Mr. Dumont claims was owed, under Louisiana law, prior to the revision. We, therefore, reject Schwab's argument that the 1995 implementation of SEC regulations concerning disclosure of order flow payments establishes that the agency previously had intended to prohibit the application of state law to such conduct.
Although we are not persuaded by the arguments advanced by Schwab, and adopted by several courts, in support of preemption, we have determined that the SEC intended Rule 10b-10, when it was adopted in 1977, to provide the sole standard of conduct for a broker-dealer's receipt of payments in connection with a customer's transaction.
The 1975 amendments to the Securities Exchange Act gave the SEC the express rule-making authority to:
assure the prompt, accurate, reliable, and fair collection, processing, distribution, and publication of information with respect to quotations for and transactions in such securities and the fairness and usefulness of the form and content of such information[.]
15 U.S.C. § 78k-1(c)(1)(B). SEC disclosure requirements pre-dating this broadened authority varied according to the market in which a transaction was effected, and in some cases mandated only that a dealer reveal the capacity in which it participated in a customer's trade. Exchange Act Release No. 34-12806 (Sept. 16, 1976), 41 Fed.Reg. 41432, 41432-33 (Sept. 22, 1976). Because of "[c]hanging business methods and the expansion of participants in the securities markets," Rule 10b-10 was proposed to both broaden the applicability of disclosure regulations and to expand the type of information to be revealed under certain circumstances. Id. In seeking comments on the proposal, the SEC emphasized its concerns about situations in which a broker might represent both parties to a transaction, as well as the necessity for distinguishing "between those who act as principals and those who act as agents, in requiring disclosures to their customers." Id. at 41433.
In announcing the adoption of Rule 10b-10 in 1977, the SEC summarized the regulation as generally providing "for the written disclosure of certain material information pertaining to a transaction effected by a broker or dealer for or with a customer." Exchange Act Release No. 34-13508 (May 5, 1977), 42 Fed.Reg. 25318, 25320 (May 17, 1977). In a footnote to this summary, it was stated that:
The rule does not attempt to set forth all possible categories of material information to be disclosed by broker-dealers in connection with a particular transaction in securities. Rule 10b-10 only mandates the disclosure of information which can generally be expected to be material. Of course, in particular circumstances, additional information *1186 may be material and disclosure may be required.
Id. at 25320 n. 28.
Mr. Dumont points to this footnote, as well as citations in other SEC releases to the Restatement (Second) of Agency, as evidence that Rule 10b-10 was intended to provide only a minimum standard of disclosure, subject to supplementation by general state law principles regarding an agent's duty to his principal. He contends that no conflict is created by enforcement of both state and federal provisions because both are intended to protect investors through the disclosure of all facts relevant to the agency relationship. We, however, must reject this argument because we find that this approach was considered by the SEC and expressly rejected.
The general summary of Rule 10b-10's implementing release, quoted above, was followed by a specification and discussion of the disclosures to be required of all brokers and dealers, including the capacity in which the firm effected the transaction. Exchange Act Release 34-13508, 42 Fed.Reg. at 25320-21. In the next section, entitled "DISCLOSURES BY A BROKER-DEALER ACTING AS AGENT," the SEC stated that "Rule 10b-10 requires any broker-dealer effecting transactions in an agency capacity to make certain additional disclosures." Id. at 25321. Remuneration was expressly included among the categories of "additional disclosures" required under these circumstances, and was explained by the SEC as follows:
Paragraph (a)(3)(ii) of the Rule requires disclosure of the remuneration to be paid by the customer, and paragraph (a)(3)(iii) requires disclosure of the source and amount of any other remuneration to be received by the broker in connection with the transaction. Paragraph (a)(3)(iii), however, alternatively permits, in most instances, a broker to state that the source and amount of other remuneration is available on request....
In proposing Rule 10b-10, the Commission noted that a number of persons had stated that there were practical difficulties in reporting on a confirmation the source and amount of remuneration paid or to be paid by someone other than the customer receiving the confirmation....
One alternative would be to rely solely on the general agency disclosure requirement with respect to source and amount of other remuneration set forth in Rule 15c1-4 since 1937. Nevertheless in view of the strong representations that have been made as to the administrative difficulties involved in providing disclosure of the type required by Rule 15c1-4, the Commission has attempted to reach an accommodation that both permits the broker-dealer community to achieve greater efficiencies in transacting and adequately protects investors....
As adopted, Rule 10b-10 permits the broker to state on the confirmation that the source and amount of other remuneration is available on request except in two situations [not applicable here]....
Id. at 25321-22 [footnotes omitted; emphasis added]. The SEC noted, in concluding this discussion, that although the adopted version of Rule 10b-10 did not require the detailed disclosures recommended by some commentators, the "substantial additional flexibility" of the Rule "could substantially solve the asserted practical problems ... without creating unnecessary risks to investor protection." Id. at 25322.
This SEC statement establishes that, when Rule 10b-10 was first implemented, it was specifically decided that the application of "general agency disclosure requirement[s]" regarding the source and amount of "other remuneration" would result in a transactional burden that outweighed any additional protections thereby afforded to investors. Although we cannot assume that payments of the type at issue here were expressly contemplated at the time Rule 10b-10 was adopted, it appears clear that the SEC intended the "additional flexibility" of this new regulation to form the sole basis for a broker-dealer's duty concerning the receipt of "other remuneration." Therefore, to measure Schwab's conduct in this case against the more exacting requirements of the Civil Code would be to interfere with the express determination of the federal agency given responsibility for such matters.
We find further support for our conclusion in a later regulatory issuance concerning *1187 Rule 10b-10. When the Rule was first implemented, the SEC gave notice that further consideration was being given to disclosure requirements relating to "special remuneration" received when a firm effected a customer trade in a principal capacity. Id. at 25318. Shortly after Rule 10b-10's adoption, however, the SEC rejected imposing additional disclosure requirements in such situations:

REMUNERATION PAID BY THIRD PARTIES TO DEALERS
The Commission has decided to withdraw its proposal to require disclosure of the source and amount of certain remuneration received or to be received by a dealer from any person other than the customer. That provision was intended to require disclosure of special or irregular inducements paid by a third party to a dealer in connection with a securities transaction.
In withdrawing a proposal to require confirmation disclosure of such payments, the Commission stresses that it is not in any way suggesting that such disclosure would not be required under other Commission rules or provisions of the act. Indeed, the Commission believes that a failure to disclose special payments intended to induce dealers to effect transactions with customers would violate the antifraud provisions of the act.
Exchange Act Release 34-15219 (Oct. 6, 1978), 43 Fed.Reg. 47495, 47501-02 (Oct. 16, 1978) [footnote omitted; emphasis added].
We recognize that, because Schwab primarily effected transactions as a broker, rather than as a dealer, the order flow payments at issue in this suit would not necessarily have fallen within the category of remuneration discussed in the subsequent issuance. Nevertheless, like the earlier SEC comments accompanying the adoption of Rule 10b-10, this statement indicates a determination that the costs incurred in providing details of all other compensation an agent might derive from a transaction, when weighed against the investor's need for information, was an unwarranted burden on the securities market. Accordingly, imposing a state-law duty upon Schwab to disclose its receipt of order flow payments from stock wholesalers, or to obtain its customers' express consent to such arrangements, would conflict with the express intent of SEC.
We find, therefore, that the claims asserted by Gordon Dumont, for himself and others similarly situated, were expressly preempted by an applicable federal regulation during the time period in question. The trial court judgment overruling the exception of no cause of action is therefore reversed and all claims are dismissed.
JUDGMENT REVERSED AND RENDERED.

LIMITED REHEARING GRANTED
The plaintiff's application for rehearing is granted for the sole purpose of amending our opinion to provide that the exception of no cause of action is maintained only as to all claims asserted under Louisiana law, as argued by the defendant. The matter is remanded for the district court to determine whether the plaintiff has, or may assert through an amended petition, any cause of action arising under federal laws or regulations within its subject matter jurisdiction.
NOTES
[1] These Civil Code articles were revised and renumbered after the events at issue here by 1997 La. Acts No. 261.
[2] There is no allegation, however, that the order flow payments themselves were in violation of any state or federal law.
[3] The Act distinguishes between a broker, who is "engaged in the business of effecting transactions in securities for the account of others," and a dealer, who engages "in the business of buying and selling securities for his own account." 15 U.S.C. § 78c(a)(4) and (5).