[No. B107907. Second Dist., Div. Four. Oct. 6, 1998.]

JOHN McKEY, Plaintiff and Appellant, v.
CHARLES SCHWAB & CO., INC., Defendant and Respondent.

COUNSEL

Girardi & Keese, Thomas V. Girardi, James B. Kropff, White & Reed, James S. Reed and Michael R. White for Plaintiff and Appellant.

Linda P. Drucker, Morgan, Lewis & Bockius, Steven J. Glouberman and Andrea Sheridan Ordin for Defendant and Respondent.

OPINION

HASTINGS, J.—Appellant John McKey (hereinafter appellant) filed a lawsuit on behalf of himself and others similarly situated against respondent Charles Schwab & Co., Inc. (Schwab), alleging a breach of fiduciary duty and bad faith based on its receipt of "order flow payments" from wholesale securities dealers. Schwab's demurrer to McKey's first amended complaint was sustained without leave to amend and the action was dismissed. The basis for the trial court's ruling was that the issues presented were pre-empted. We affirm the judgment (order of dismissal).

FACTUAL AND PROCEDURAL BACKGROUND

1. *The practice of order flow payments*

Schwab is a national discount securities brokerage firm which appellant used as his broker for the buying and selling of securities. When a customer authorizes Schwab to buy or sell securities, Schwab directs or routes the order to an exchange, a wholesale securities dealer or a "market maker." Schwab charges a commission to its customer for its services. In a practice which became prevalent in the 1960's and now is widespread in the industry, the wholesale dealers or market makers may give monetary and nonmonetary incentives to brokers such as Schwab to attract their business. Some incentives are in the form of credits, reciprocal privileges and other services, but most of these incentives are given in amounts proportionate to the numbers of shares in the orders, that is a few pennies per share. (*Dahl* v. *Charles Schwab & Co., Inc.* (Minn. 1996) 545 N.W.2d 918; *Shulick* v. *PaineWebber, Inc.* (Pa.Super.Ct. 1997) 700 A.2d 534.) These payments, known as "order flow payments" are now so prevalent that they can amount to millions of dollars per dealer. Moreover, with the advent of computer advances and automated trading systems, the practice of making order flow payments has become large scale and complex. Payments are measured in thousands of shares, and it is now difficult to ascertain what amounts are received for any individual transaction. (*Dahl* v. *Charles Schwab & Co., Inc.,*

*supra,* 545 N.W.2d at p. 921; *Guice* v. *Charles Schwab & Co., Inc.* (1996) 89 N.Y.2d 31 [651 N.Y.S.2d 352, 674 N.E.2d 282, 284].)

### 2. *The nature of the complaint*

Appellant's complaint attacks the practice of order flow payments, claiming that the receipt of such remuneration by a broker is a violation of the broker's fiduciary duties to its customers. The thrust of the complaint is that a broker which receives monetary and nonmonetary incentives from wholesale securities dealers will place its order with those dealers, without regard to the best interests of the customer. The complaint specifically deals with order flow payments received prior to October 2, 1995, since after that date, the Securities Exchange Commission (SEC) implemented new rules which specifically address the practice of order flow payments and the duties of brokers in disclosing such payments.

As amended, the complaint states causes of action for: (1) breach of fiduciary duty of full disclosure; (2) breach of fiduciary duty to avoid self-dealing; (3) a common count for money had and received; and (4) breach of implied covenant of good faith and fair dealing. McKey seeks an accounting of all moneys and credits received by Schwab, damages including the amount of all order flow payments made to Schwab, a forfeiture of all commissions earned by Schwab on the affected transactions, and costs and attorneys fees.

### 3. *Old rule 10b-10*

From 1977 through October 1995, SEC rule 10b-10 (17 C.F.R. § 240.10b-10(a)(7) (hereinafter old rule 10b-10)) provided, in relevant part: "It shall be unlawful for any broker or dealer to effect for or with the account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security . . . unless such broker or dealer, at or before completion of such transaction, *gives or sends to such customer written notification disclosing:* . . . [¶] . . . [¶] (7) If he is acting as agent for such customer, for some other person, or for both such customer and some other person, [¶] . . . [¶] (iii) *The source and amount of any other remuneration received or to be received by him in connection with the transaction;* Provided, however, [t]hat if, in the case of a purchase, the broker was not participating in a distribution, or in the case of a sale, was not participating in a tender offer, *the written notification may state whether any other remuneration has been or will be received and that the source and amount of such other remuneration will be furnished upon written request of such customer. . . .*" (Old rule 10b-10, italics added.)

Beginning in 1993, in recognition of the rapidly developing practice of order flow payments, the SEC began studying the practice and its effect on the industry, and began proposing new rules to regulate the practice, including amendments to old rule 10b-10. The new rules, 11Ac1-3 (17 C.F.R. § 240.11Ac1-3 (new rule 11Ac1-3)), and an amendment to old rule 10b-10, were adopted in October 1994, but were not to become effective until October 2, 1995. New rule 11Ac1-3 required annual disclosure to customers of a broker's or dealer's policies regarding receipt of order flow payments, the names of the market makers to whom the orders are routed and the aggregate amount of payment received for order flow in the previous year.[1] This rule was not in effect during the relevant time period alleged in the complaint.

### 4. Schwab's demurrer

Schwab demurred to appellant's first amended complaint on the grounds that the remedies sought violated the supremacy clause and the commerce clause of the United States Constitution and thus that the issues raised should be deferred to the SEC under the doctrine of primary jurisdiction.

---

[1]New rule 11Ac1-3 read as follows: "Customer account statements. [¶] (a) No broker or dealer acting as agent for a customer may effect any transaction in, induce or attempt to induce the purchase or sale of, or direct orders for purchase or sale of, any national market system security as defined in § 240.11Aa2-1, unless such broker or dealer informs such customer, upon opening a new account and on an annual basis thereafter, of the following: [¶] (1) The firm's policies regarding receipt of payment for order flow as defined in § 240.10b-10(e)(9), from any broker or dealer (including market makers) exchange members or exchanges to which it routes customers' orders for execution, including a statement as to whether any payment for order flow is received for routing customer orders and a description of the nature of the compensation received; and [¶] (2) The aggregate amount of monetary payments, discounts, rebates or reduction in fees received by the firm on an annual basis that were disclosed pursuant to § 240.10b-10(7)(iii)." (58 Fed.Reg. 52943.)

Old rule 10b-10 was amended by renumbering and adding the following sections:

"(iii)(A) Whether any payment for order flow has been received in connection with a transaction in a national market system security as defined in § 240.11Aa2-1; and [¶] (B) For any monetary payment, discount, rebate or reduction of fee received in connection with a transaction in a national market system security, the amount of such monetary payment, discount, rebate or reduction fee. . . ."

"(e) [¶] . . . [¶] (9) 'Payment for order flow' means any compensation received from any broker-dealer (including market makers), exchange members, or exchanges to which a broker-dealer routes customers order for execution, including: monetary payments, research, products or services; reciprocal agreements for the provision or over flow; clearing or other services; adjustment of a broker-dealer's unfavorable trading errors; offers to participate as underwriter in public offerings; stock loans and shared interest accrued thereon; discounts and rebates, or any other reduction of credit against any fee, expense or other financial obligation of the broker or dealer routing a customer order." (58 Fed.Reg. 52943.)

## 5. *Trial court's ruling*

The trial court's order incorporated its written tentative ruling, which stated, inter alia, "5. On the issue of federal preemption from the Supremacy Clause: [¶] . . . [¶] B. There is implied preemption. Old Rule 10b-10 permitted the practice of payment for order flow, and implicitly prescribed that no further notice was required. There is no indication that old 10b-10 was prescribing only a minimum standard. It was a statement of what constituted lawful compliance—how much disclosure was enough. This implicitly provides that no more is required. [¶] The additional standards proposed by the Miller plaintiff[2] would stand as an obstacle to the federal regulatory scheme. Miller insists that notice include disclosure of the actual amount of payment for order flow, on a trade-by-trade bases. The Court cannot say that this would be virtually impossible—that is a factual question. Probably more disclosure could be made. [¶] But it is clear, even on this record, that such disclosure would be very difficult. Further, it would open the area to 50 different states' separate standards. [¶] Plaintiffs seek to impose those obvious burdens to remedy a harm that is, at best, abstract."

## 6. *Contentions on appeal*

■ On appeal, appellant contends that there is no basis for the trial court's holding that his claims are preempted, specifically that there is no evidence that Congress, the SEC or the California Legislature intended to extinguish the common law fiduciary duties of brokers with regard to disclosure of their receipt of order flow payments.

DISCUSSION

## 1. *General preemption principles*

■ The supremacy clause of the United States Constitution requires the courts to follow federal, not state law, as long as it is clear that Congress intended to eclipse the historic police powers of the state. (U.S. Const., art. VI, cl. 2; *Barnett Bank of Marion Cty., N.A.* v. *Nelson* (1996) 517 U.S. 25, 30 [116 S.Ct. 1103, 1107, 134 L.Ed.2d 237]; *Rice* v. *Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447]; *Jones* v. *Rath Packing Co.* (1977) 430 U.S. 519, 525 [97 S.Ct. 1305, 1309, 51 L.Ed.2d

---

[2]This case was apparently argued concurrently with another case (Miller v. Charles Schwab & Co. (Super. Ct. L.A. County, No. BC137133)) dealing with the same issues, but the record contains no information about this case or its present status.

604].) If there is no language in a federal statute which expressly states that Congress has intended to preempt state law, courts must examine whether the statute's structure and purpose or its nonspecific language reveal an implicit preemptive intent. In deciding this question, courts must make the following inquiries: (1) does the federal statute create a scheme of federal regulation that is so pervasive that it can reasonably be inferred that Congress left no room for the states to supplement it; (2) does the federal statute irreconcilably conflict with state law; or (3) does the state law stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress? If any of these questions can be answered affirmatively, then congressional intent to preempt state law must be implied. (*Barnett Bank of Marion Cty., N.A.* v. *Nelson, supra,* 517 U.S. at p. 31 [116 S.Ct. at p. 1108]; *Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581].)

Here, the parties are in agreement that federal securities law does not prohibit the states from enacting laws on securities matters. In fact, section 28(a) of the Securities Exchange Act (15 U.S.C. § 78bb(a)) provides that "The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity."

However, this provision does not foreclose the possibility of implied preemption (*Freightliner Corp.* v. *Myrick* (1995) 514 U.S. 280, 287 [115 S.Ct. 1483, 1487-1488, 131 L.Ed.2d 385]; *Edgar* v. *MITE Corp.* (1982) 457 U.S. 624, 631 [102 S.Ct. 2629, 2634-2635, 73 L.Ed.2d 269]), and that is the issue we must resolve.[3] We are not without guidance, as several other states have considered the precise issue presented here. The overwhelming weight of authority, as discussed below, is that there is implied preemption.

2. *Cases which found preemption*

a. *Dahl v. Charles Schwab & Co., Inc., supra, 545 N.W.2d 918, certiorari denied 519 U.S. 866 [117 S.Ct. 176, 136 L.Ed.2d 116].*

In *Dahl,* Minnesota citizens who utilized Schwab as their broker for buying and selling securities filed three separate but similar class actions against Schwab, contending that Schwab's receipt of order flow payments constituted a breach of fiduciary duty under Minnesota's common law of

---

[3]The trial court found there was no express preemption. In its brief respondent argued that there was express preemption but its primary argument was that there was implied preemption.

agency and its Uniform Deceptive Trade Practices Act. They sought an accounting of all Schwab's profits received in such transaction, forfeiture of all order flow payments received by Schwab, a declaration that Schwab fraudulently concealed its wrongdoing, and an injunction to prevent Schwab from receiving future order flow payments without a customer consent. (545 N.W.2d at p. 920.) Judgment on the three complaints was entered by the trial court in favor of Schwab on the grounds that the application of Minnesota law was preempted by the rules of the SEC. The trial court's judgment was reversed by the state court of appeals, but then reinstated by the state supreme court.

The reasoning of the Minnesota Supreme Court was as follows: While neither old rule 10b-10 nor a 1985 NASD (National Association of Securities Dealers) notice to members expressly preempted the application of state law, implied preemption was found because the remedy sought by the plaintiffs could frustrate the objectives of the SEC and Congress. More specifically, under Minnesota law, brokers would be required to ascertain the exact amount of order flow payments attributable to each of their customers, disclose such amount to each customer and remit that amount to any customer who did not consent to the broker's receipt of that payment. (545 N.W.2d at p. 925.) Since order flow payments are often made on a large scale (that is, often based on orders of tens of thousands of shares) and are often nonmonetary, compliance with state laws might terminate the practice entirely. This result would conflict with federal law, which allows order flow payments. (*Id.* at p. 925.)

 b. *Guice v. Charles Schwab & Co, Inc., supra, 674 N.E.2d 282, certiorari denied 520 U.S. 1118 [117 S.Ct. 1250, 137 L.Ed.2d 331]*.

Six months after the *Dahl* decision, the Court of Appeals of New York decided *Guice*. As in *Dahl*, plaintiffs in *Guice* were retail customers of Schwab and another discount stock brokerage house who brought class actions based on common law theories of breach of fiduciary duty and conversion arising out of the agency relationships with the brokers. They sought a return of commissions, compensatory and punitive damages, an accounting, and injunctive relief. The complaints were dismissed on the grounds that the claims were preempted by the Securities Exchange Act of 1975 and corresponding regulations.

The *Guice* court found the 1975 amendments to the Securities Exchange Act were intended to spark the development of a national market system for security trading and to give the SEC power to administer and regulate that

national system. (674 N.E.2d at p. 289.) Allowing state courts to enforce common law agency disclosure requirements would defeat the purpose of giving the SEC such power. The court stated: "[T]he 1975 amendments to the Securities Exchange Act were intended to give the SEC the power administratively to develop a 'coherent and rational regulatory structure to correspond to and to police effectively the new national market system' (Sen. Rep. No. 94-75, at 2, *op. cit.*, 1975 U.S.Code Cong. & Admin. News 179, 181). Among the goals of Congress in that legislation was to spark the creation of such a national market system for security trading, which would assure more 'economically efficient execution of securities transactions' and promote greater competition among all securities industry players, including competition 'between exchange markets and markets other than exchange markets' (Pub. L. 94-29, § 7, 89 U.S. Stat., at 111-112, codified at 15 U.S.C. § 78k-1[a][1][C]). The SEC was directed administratively to promote those goals. . . . [¶] . . . [¶] . . . Thus, although both State common-law actions and Federal regulations may promote broker-dealers' disclosure to customers, State enforcement of agency law standards of disclosure cannot help but upset the policy-based delicate balance Congress directed the SEC to achieve in the regulatory regime envisaged under the 1975 amendments to the Securities Exchange Act. Here, as in *International Paper Co. v. Ouellette* [(1987) 479 U.S. 481, 497 [107 S.Ct. 805, 813-814, 93 L.Ed.2d 883]] (where State common-law nuisance actions also threatened to upset a Federally designed, legislative/regulatory interest-weighing cost/benefit approach), '[i]t would be extraordinary for Congress, after devising an elaborate [balanced regulatory] system that sets clear standards, to tolerate common-law suits that have the potential to undermine this regulatory structure' [citations]." (*Id.* at pp. 289-291.)

The court also found that while complying with both the state law and the SEC's regulations might not be impossible, there would be an adverse effect on the ability of the SEC to regulate comprehensively and uniformly. In addition, faced with the threat of having to comply with more onerous and more numerous disclosure requirements, brokerage firms might abandon the practice of order flow payments altogether. (674 N.E.2d at p. 290.)

The *Guice* court held that section 28(a) of the Securities Exchange Act, the savings clause of which provides that the Securities Exchange Act's rights and remedies are " 'in addition' to any and all other rights and remedies that may exist at law or in equity,' " did not foreclose a finding of preemption, especially where as here, enforcement of state common law duties would undermine the federal regulatory structure. (674 N.E.2d at p. 291.)

c. *Eirman v. Olde Discount Corp. (Fla.Dist.Ct.App. 1997) 697 So.2d 865*

In *Eirman,* the District Court of Appeal in Florida affirmed the dismissal of a complaint by an individual customer of a discount brokerage house, expressly adopting the reasoning of *Dahl* and *Guice.*[4]

d. *Orman v. Charles Schwab & Co., supra, 688 N.E.2d 620, certiorari denied (1998) __ U.S. __ [118 S.Ct. 1518, 140 L.Ed.2d 670]*

*Orman* also involved the dismissal of consolidated class actions brought by customers of discount brokerage firms for their failure to remit to those customers order flow payments. The actions were based on breach of agency and contract law theories.

The Illinois Supreme Court found that plaintiffs' state claims were implicitly preempted by the Securities Exchange Act. Expressly relying on *Guice* and *Dahl,* it held that given the history and purpose of the 1975 amendments to the Securities Exchange Acts as well as subsequent regulation implemented by the SEC regarding order flow payment disclosures, held that allowing the plaintiffs to maintain their state claims would obstruct the national market system that Congress intended to foster.

e. *Shulick v. PaineWebber, Inc., supra, 700 A.2d 534*

In *Shulick,* a single customer filed an action against a brokerage firm, alleging breach of fiduciary duty and breach of contract under state common law. The Pennsylvania intermediate appellate court found implied preemption, following *Guice.* (700 A.2d at p. 538.)

3. *Cases which found no preemption*

Despite the number of federal cases that have found implied preemption appellant argues that we should rely instead on two federal district court cases which support his position.[5]

In *Gilman v. Wheat, First Securities, Inc.* (D.Md. 1995) 896 F.Supp. 507, certiorari granted on other grounds (1996) 342 Md. 633 [679 A.2d 539], a

---

[4]The court also relied on the decision of an intermediate Illinois court in *Orman v. Charles Schwab & Co., Inc.* (1997) 179 Ill.2d 282 [227 Ill.Dec. 927, 688 N.E.2d 620], which was later affirmed by the Illinois Supreme Court, and discussed in this part. (697 So.2d at p. 865.)

[5]A third case cited by appellant, *Dumont v. Charles Schwab* (E.D.La. 1995) 1995 WL 262262, was reversed by the Fourth Circuit Court of Appeal on April 8, 1998 (La.Ct.App. 1998) 717 So.2d 1182. That court found that the claims asserted were expressly preempted by old rule 10b-10 during the applicable time period.

class action was brought on behalf of all persons who had a brokerage account with defendant, and alleged various Maryland statutory and common law violations in connection with defendant's receipt of order flow payments. It sought unspecified damages, and declaratory and injunctive relief prohibiting defendant from continuity the receipt of such payments. The case was filed in state court, and removed to federal district court, asserting diversity and federal question jurisdiction. The court decided there was no diversity and no federal question because there was no complete federal preemption of the field of securities. (896 F.Supp. at p. 511.)

In the decision of *Thomas* v. *Charles Schwab & Co., Inc.* (W.D.La. 1995) 1995 WL 626522, a lawsuit for breach of agency and breach of fiduciary duties against Schwab, the court concluded there was no express preemption of state law by Congress and that congressional intent to preempt state law cannot be inferred. In addition, the court noted that additional state requirements regarding disclosure do not conflict with SEC regulations. It was not persuaded by defendant's claim that there was congressional intent to provide comprehensive regulations dealing with the disclosure of order flow payments to the exclusion of all state laws regarding agency and breach of fiduciary duty.

### 4. *Conclusion*

Appellant attempts to distinguish *Dahl, Guice, Orman, Eirman* and *Shulick* by arguing that these cases "generally involved broader allegations than those asserted by McKey, including pleas for injunctive relief and contentions that the defendant brokers committed criminal acts or violations of state securities laws and other statutes." In addition, he claims that *Guice* is based on the erroneous premise that old rule 10b-10's disclosure requirements applied to order flow payments and that *Guice* should not be followed because "prior to October 2, 1995, no federal statutes or regulations existed which pertained to disclosure requirements for order flow payments."

Because appellant's complaint deals only with order flow payments received before October 1995, we must ignore the obvious intent manifested by Congress in amending old rule 10b-10 and adding new rule 11Ac1.

Appellant's insistence that prior to October 1995, there was no rule or regulation pertaining to order flow payments is without merit. Old rule 10b-10 clearly sets forth the rules to be followed regarding disclosure of any other remuneration received by a broker or dealer in connection with a securities transaction. Simply because the rule does not specifically mention order flow payments does not mean that the rule does not apply to them. In

fact, the rule clearly evidences an intent by the SEC to regulate disclosure of remuneration received by brokers and dealers.[6]

We are also persuaded by the rationale of the *Guice* court that the 1975 amendments to the Securities Exchange Act were intended to promote a national market system and to give the SEC the power to administer and regulate that system. Allowing each state to enforce its own laws with respect to disclosure of broker remuneration would clearly hamper those goals. Appellant's attempts to distinguish *Guice* on the grounds that it involved broader claims than those presented here are without merit, as *Guice* clearly disposed of the identical issue presented here.

Because we have found implied federal preemption by the 1975 amendments to the SEC and old rule 10b-10, we need not address the arguments relating to the commerce clause and California Code of Regulations, title 10, section 260.216.2.

### DISPOSITION

The judgment (order of dismissal) is affirmed. Respondent Schwab shall recover its costs on appeal.

Vogel (C. S.), P. J., and Epstein, J., concurred.

---

[6]At oral argument appellant argued that old rule 10b-10 was not specific enough to evidence an intent to regulate order flow payments. By examining the tree so closely appellant misses the forest. It is clear that the rule is intended to regulate any and all remuneration received by brokers, no matter what the form.